

## *MEMORANDUM*

POLICE
CITY OF PHILADELPHIA
Date: 4-22-15

TO : Police Commissioner

FROM : Commanding Officer, Internal Affairs Division

SUBJECT: <u>INTERNAL INVESTIGATION, IAD #14-1189</u>

### <u>ALLEGATION</u>

On Thursday, 11-13-14, Captain Carol Abrams #54, Internal Affairs, was notified by Sgt. Timothy Linneman #483 of allegations of sexual assault, as a result of an interview conducted during an EEO investigation. IAD control #14-1189 was issued.

Complainant, Det. Michele Vandegrift #755, Payroll #251357, South Detective Division, alleged that sometime during March of 2007, she was sexually assaulted while on-duty by then Inspector Carl Holmes; while inside his office at East Detective Division.

Det. Vandegrift also alleged that on an unknown date, time, and location, P/O Joseph Davis, exposed his erect penis to her while they worked together in a patrol car.

| Officer | Badge | Payroll | Appoint Date | District | Date Assigned |
|---------|-------|---------|--------------|----------|---------------|
| Holmes, Carl | | 206865 | 03-26-90 | School Safety | 10-24-13 |
| Davis, Joseph | 5310 | 263764 | 12-17-07 | 9th/ 50 | 10-13-08 |

On 11-13-14, Lt. Ray A. Saggese #163, Internal Affairs, was assigned to this investigation.

### <u>INVESTIGATIVE ANALYSIS</u>

**Detective Michele Vandegrift #755, Payroll #251357, South Detective Division,** was interviewed on 12-12-14, by Lt. Ray A. Saggese #163, at Internal Affairs.

Det. Vandegrift stated in summary, that while assigned to the 24th District, sometime during 2007, she had become friends with Carl Holmes, who was the East Division Inspector at the time. She had met then Inspector Holmes during her agility test prior to entering the Police Academy.

Det. Vandegrift stated that Insp. Holmes initiated contact with her and began calling her on her cell phone. Det. Vandegrift described these phone calls from Insp. Holmes as mainly one sided, beginning shortly after his assignment to East Division. Although they talked about things related to work, and on several occasions, Insp. Holmes told Det. Vandegrift that if he were alone with her, he would perform various sex acts on her. During one conversation, Insp. Holmes told her, "I would love to bend you over."

City293

APPENDIX 965

 

Det. Vandegrift stated that she never told Insp. Holmes that his sexual conversations, or dirty talk with her made her feel uncomfortable and, that she did not ask him to stop calling her.

Det. Vandegrift also met Insp. Holmes at an unknown bar, on an unknown date and time, where the two of them had drinks. Det. Vandegrift stated the reason she met with Insp. Holmes was that she wanted to develop a friendship with him, and believed it would help her with her career. Det. Vandegrift stated that she felt as though if she had stopped paying attention to Insp. Holmes, she would lose the opportunity to work in the Inspector's office, or get transferred to a special unit.

Sometime near the end of February, or in March, of 2007, Det. Vandegrift stated that Insp. Holmes stuck his finger(s) into her vagina without her consent. Det. Vandegrift stated that while she was assigned as a uniformed Police Officer in the 24th District, working steady 12:00 AM to 8:00 AM, she was summoned by Insp. Holmes to his office in East Division. Det. Vandegrift stated she had never been to his office. Once she arrived in his office, Insp. Holmes approached her and requested to know how wet her vagina was. She described Holmes as smoking and smelling like alcohol. Insp. Holmes then unzipped her uniform pants, placed his big hands inside her pants, moved aside her underwear, and inserted his finger into her vagina. Insp. Holmes pulled his hand out and tasted his finger, and said it tasted good. During the sexual assault, she did not say anything to Insp. Holmes, because she was in shock.

Det. Vandegrift stated she was inside Insp. Holmes' office for approximately 3-5 minutes and that the sexual assault lasted about a minute. When the incident was over, she left Insp. Holmes' office and did not mention the incident to anyone, until her interview with Sgt. Linneman.

Det. Vandegrift stated that Insp. Holmes never exposed himself to her at any time, and he never previously asked to touch her, or have sex with her, although indirectly by his conversations with her, she knew he wanted to have sex with her. Prior to the incident, she stated she was comfortable with him and did not feel threatened in any manner. Insp. Holmes called her one more time after the incident, but Det. Vandegrift stated she did not answer her phone. They never talked since that night. She was later transferred to the 9th District.

Det. Vandegrift stated that a co-worker exposed his penis to her on a previous and separate occasion, while on duty. On an unknown date, time, and location, she was assigned to the 9th District, working the steady 12:00 AM to 8:00 AM, along with P/O Joseph Davis.

While in uniform, on routine patrol in a marked police vehicle, possibly 9T1, she and P/O Davis were checking Fairmount Park for vagrants sometime between 4AM and 6 AM. P/O Davis, without warning or request, pulled out and exposed his erect penis to Det. Vandegrift. He did not say anything to Vandegrift. Det. Vandegrift yelled, "Oh my god Joe what are you doing?" P/O Davis zipped up. They did not talk about the incident any further, and finished their tour of duty.

City294

 

Det. Vandegrift did not say anything to anyone about this incident at the time, and was not sure if she continued to work with P/O Davis after the incident.

Det. Vandegrift stated that she and P/O Davis had worked together for a short time prior to the incident, and that P/O Davis had expressed issues of being in a bad relationship. Det. Vandegrift also stated that P/O Davis had previously flirted with her and made it known to her that he wanted to have a relationship with her.

Det. Vandegrift had reported these incidents to Sgt. Linneman #485, during his EEO interview of her on 11-1-14. IAD EEO control #14-0029. She also reported them in her EEO complaint with Pennsylvania Human Relations Commission (PHRC) on 10-26-14. Both documents are attached to this investigation.

**Det. Joseph Newbert #8021, Payroll #223938, East Detective Division,** was interviewed on 1-07-15, by Lt. Ray A. Saggese #163, at Internal Affairs. Det. Newbert stated he had no knowledge of any incident involving Michele Vandegrift and Insp. Holmes in March 2007. Det. Newbert denied ever seeing Michele Vandegrift entering or leaving Insp. Holmes' office.

**Lt. Edward Thompson #264, Payroll #208637, Central Detective Division,** was interviewed on 1-08-15, by Lt. Ray A. Saggese #163, at Internal Affairs. Lt. Thompson stated in summary that he considered Michele Vandegrift a friend, since meeting her sometime in 2009. She recently had been a guest at his wedding on 10-05-14.

Lt. Thompson stated that Michele Vandegrift never mentioned or divulged any information to him concerning a co-worker from the 9th District exposing his penis to her while working. Lt. Thompson also had no knowledge of any relationship or incidents between Carl Holmes and Michele Vandegrift.

A copy of the Philadelphia Police Department Daily Attendance Reports for the 24th, 25th, and East Detectives for the month of March 2007 were obtained. Paper reports such as Patrol Logs and Assignment Sheets could not be obtained, as they were passed the 5 year retention period for such records.

**P/O Jacqueline Geiger #3023, Payroll #223870** was interviewed on 3-27-15, by Lt. Ray A. Saggese #163, at Internal Affairs. P/O Geiger stated in summary that she has been assigned as Chief Insp. Holmes aide for the last twelve years, while he held various assignments. During 2007, she was his aide while he was assigned to East Police Division.

P/O Geiger stated that she knows Chief Insp. Holmes and his family personally, and has attended various functions of his family, including his wedding.

City295



P/O Geiger stated that in 2007, she knew Det. Vandergrift (formerly P/O Lauf, then assigned to the 24th District) and had noticed her to flirt with male officers a lot. P/O Geiger did not know who, if anyone, P/O Lauf was involved with at the time.

P/O Geiger stated she never saw P/O Lauf inside then Insp. Holmes' office, or talking with him ever. She also never took, or knew of, any phone calls or conversations about her and then Insp. Holmes.

During the years she has worked for Chief Insp. Holmes, he has never spoken to her unprofessionally while she worked for him.

**P/O Joseph Davis #5310, Payroll #263764, 9th District,** was interviewed on 3-10-15, by Lt. Ray A. Saggese #163, at Internal Affairs.  P/O Davis stated in summary that he previously worked with Det. Vandegrift, when she was assigned to the 9th District.  P/O Davis stated that he did not work with her steadily, but for a few days a week for several months, sometime during 2009.

During the times he worked with her, they talked about various things, including their personal lives, but P/O Davis could not provide any details.  P/O Davis denied confiding in Det. Vandegrift about any issues pertaining to his then girlfriend and sex.  P/O Davis denied talking about having any relationship with Det. Vandegrift and never asked her to have one; nor did she ever ask him to have a relationship with her.

P/O Davis denied socializing with Det. Vandegrift.  P/O Davis denied exposing himself (his penis) to her at any time ever, and had no idea why Det. Vandegrift would make such an allegation against him.

**Chief Inspector Carl Holmes, Payroll #206865, Office of School Safety,** was interviewed on 3-18-15, by Lt. Ray A. Saggese #163, at Internal Affairs.  C/I Holmes stated in summary that he has known Det. Michelle Vandegrift (formerly Michelle Lauf) since he was an Inpsector in the Police Academy and she was a recruit.  He also knew her father, Det. Thomas Lauf.

C/I Holmes stated that he never met Det. Vandegrift at any bar at any time, especially during 2007.  C/I Holmes denied ever confiding in Det. Vandegrift about his personal life, and had no recollection of talking to her via phone.  C/I Holmes denied calling Det. Vandegrift and expressing sexual desires to her via phone, as well as talking in person to her about sex.

C/I Holmes denied that Det. Vandegrift was ever inside his office, at East Division, or anywhere ever.  C/I Holmes denied requesting, or talking about, having any type of relationship with her.

Specifically, C/I Holmes denied, calling Det. Vandegrift to his office in 2007, while he was the Inspector there, and denied sexually assaulting her, or touching her, inserting his fingers into her vagina, either consensually, or against her will.

City296

APPENDIX 968



C/I Holmes also denied having anything to do with her transfer to the 9th District.

C/I Holmes ended his statement with the following: "I understand as a licensed attorney in the Commonwealth of PA since 2003, that government entities must investigate allegations of misconduct. However, I am urging this process to understand that when they take allegations of misconduct that are six, seven eight years old in some cases, with the same theme, with particular allegations against a Commander such as myself, and further when these allegations in several instances have proven to be false and malicious, I would ask that IAD take all due care and consideration prior to disrupting both my professional and personal life with such patently false allegations. Lastly, the chronology of these allegations defy all logic. Considering in the intervening years, while I was under a very visible active investigation in 2008, and under very scrutinous observation by the Press in 2012, if true, these allegations most likely would have been brought to light back then. With that I close my statement formally."

A copy of the Philadelphia Police Department Daily Attendance Reports for Det. Michele Vandegrift, Payroll #251357 and Chief Insp. Carl Holmes, Payroll #206865 for 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 were obtained. Additionally, the same reports for the 9th District for 2009 were obtained, and are attached to a computer disk, since it is too lengthy to print out.

These records reveal that Det. Michele Vandegrift was assigned to the 24th District from 10-29-04, until transferred to the 9th District on 9-05-07.

These records also reveal that Chief Insp. Holmes was assigned as the Inspector of East Police Division on 8-09-05, until reassignment, and demotion to Captain, on 5-16-08 to South Detective Division.

On 12-03-14, the assigned contacted Liz Howard and Sheri Leaks, Administrative Analysis, in reference to phone records and phone assignments for C/I Holmes. It was revealed that C/I Holmes has had the same City of Philadelphia phone number (267-438-7118) since 12-26-07, and has had several replacement phones since that time. Records for that phone number were available only back to 11-01-07. Therefore, records pertaining to any such phone contact between Carl Holmes and Michele Vandegrift, prior to and including March of 2007, were unobtainable.

On 12-19-14, Det. Vandegrift provided a cell phone to Lt. Ray A. Saggese #163, which she confirmed she used and possessed during March 2007. Det. Vandergrift signed a Consent to Search Form, providing full consent for a detailed Forensic Analysis to be conducted of the phone by Lt. Saggese at RCFL.

Property Receipt #3132704 was prepared for (1) Samsung plastic flip phone, Model SCH-A670, Serial #04108526534, grey in color.

City297

APPENDIX 969

On 12-30-14, this phone was taken to the Regional Computer Forensics Lab (RCFL) located at 201 King of Prussia Rd. Suite 300, Radnor, PA 19087 for analysis. This analysis revealed negative results for any information concerning cell phone call logs, text messages, emails messages, photos and contacts pertaining to any of Det. Vandegrift's allegations.

A review of Det. Vandegrift's allegations, interviews, and other parts of this investigation were not sent to the Office of the Philadelphia District Attorney, due to a lack of probable cause.

SUBMITTED BY:

Ray A. Saggese
Lieutenant                    #163
Internal Affairs Division

REVIEWED AND APPROVED BY

Charles Vogt
Captain                       #115
Internal Affairs Division

City298

 

<u>CONCLUSION</u>

The allegation of aggravated sexual assault by Chief Inspector Holmes, as alleged by Det. Michelle Vandegrift, is **NOT SUSTAINED**.

Det. Michelle Vandegrift alleged that on an unknown date and time, in March of 2007, she was the victim of an aggravated indecent assault by Chief Inspector Carl Holmes, who was at that time, an Inspector assigned to East Police Division.  Det. Vandegrift alleged Chief Holmes unzipped her pants zipper, pulled her panties aside, and placed his fingers into her vagina without her consent.  She did not object to the action, and did not yell, scream, or alert anyone to come to her aid during the assault; despite being inside an occupied Police facility. Det. Michelle Vandegrift made this allegation during an interview with Sgt. Timothy Linneman #483, IAD - EEO, on 11-11-14, over seven years after the alleged assault. She further described the events in another interview with this assigned investigator.

Det. Vandegrift stated that since the alleged assault, she made no mention of the specific incident to anyone. By her own admission, at the time the assault took place, there were no witnesses present to corroborate her allegation.

The allegation of sexual harassment via telephone against Chief Inspector Holmes, as alleged by Det. Michelle Vandergrift, is **NOT SUSTAINED.**

Det. Vandegrift alleged that Chief Inspector Holmes repeatedly called her via telephone, and would speak with her detailing the sexual positions and desires he had with her in mind. Despite the repeated phone calls, Det. Vandegrift stated she never objected to Chief Inspector Holmes about his conversations, and never told him to stop calling her.

Chief Inspector Holmes outright denied any and all allegations of aggravated indecent assault by him on Det. Vandegrift, as well as any sexually charged phone conversations, with Det. Vandegrift. He labeled her allegations as false with an aim towards some type of litigation.

Det. Vandegrift provided her cell phone that she used during the time of the incidents, in order to corroborate his phone calls.  However, a forensic analysis did not uncover any calls. Contact with cell phone providers for both C/I Holmes and Det. Vandegrift resulted in information that was dated too long ago for records to exist. Therefore, no phone records were uncovered.

The allegation of indecent exposure against P/O Joseph Davis #5310, as alleged by Det. Michelle Vandegrift, is **NOT SUSTAINED.**

Det. Michelle Vandegrift alleged that on an unknown date, time, and location in 2009, while she was assigned work to the 9th District in uniform, while working a patrol car with P/O Davis, he exposed his erect penis to her while they were alone in a patrol car together.

APPENDIX 971

City299



Det. Vandegrift stated that they were alone at the time, there were no witnesses, and she never told anyone of the incident. However, she did admit that she continued to work with P/O Davis, and never spoke of the incident with him or anyone else.

P/O Davis denied ever exposing his penis to Det. Vandegrift; either at her request, without her knowledge, or against her will.

This investigation will be forwarded to the Office of the Police Commissioner for their review, and returned to the Office of Professional Responsibility.

Kevin Hall
Inspector
Internal Affairs Division

APPENDIX 972

City300

 

## Internal Investigation / Confidential

### 14-1189

### CONFIDENTIAL INVESTIGATION

Assigned Lt. Saggese #163 /Squad 4

Supervisor: Capt. Carol Abrams-Scott #54

COMMANDING OFFICER
INTERNAL AFFAIRS DIVISION
TO _Sqd #4_

NOV 1 4 2014

☐ ALTION AND REPLY
☑ ACTION AND REPORT
☐ ACTION, NO REPORT
☐ INFORMATION & FILE
SUSPENSE DATE _Internal_

_Saggese_

 

| | |
|---|---|
| STATEMENT OF: | Det. Michele Vandegrift #755 |
| | PR #251357 |
| | Assignment: Southwest Detectives (detailed) |
| | Date of Appt: 5-03-04 |
| | Date of Assignment 9-05-14 |
| DATE AND TIME: | Friday, 12-12-14, @ 9:45 AM |
| PLACE: | Internal Affairs |
| | 7790 Dungan Rd. |
| CONCERNING: | IAD # 14-1189 |
| IN PRESENCE OF: | Caren N. Gurmankin, Attorney |
| RECORDED BY: | Lt. Raymond Saggese #163. |

I am Lt. Ray Saggese #163 of Internal Affairs, and I will be taking your statement. I have been assigned to investigate an allegation of sexual misconduct.

Q. Are you represented by counsel?
A. Yes.

Q. Have you had the opportunity to discuss this matter with your attorney?
A. Yes.

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Signature of Det. Michele Vandegrift #755 _Det. Michele Vandegrift #755_

City302

 

Q. Det. Vandergrift, you were previously interviewed by Sgt. Timothy Linneman #483 on 11-11-14. Do you recall that interview?
A. Yes.

Q. I would like to ask you some additional questions in reference to a particular incident with Chief Holmes and P/O Davis Is that OK??
A. Yes.

Q. Det. Vandergrift, can you tell me what your specific assignment was in 2007?
A. I was a police officer assigned to the 24th District. I was assigned to 3A platoon.

Q. Were you in uniform or plainclothes?
A. Uniform.

Q. Can you recall who your direct supervisor(s) were?
A. I had multiple supervisors, I believe but not completely sure that my direct supervisor was Sgt Austin Frazier , my Lieutenant was McIllhenney.

Q. In your interview, you mentioned that then Insp. Carl Holmes, called you to his office, where he sexually assaulted you. At that time, was Insp. Carl Holmes your supervisor?
A. He was the Inspector of East Division, top boss.

Q. Can you explain what type of relationship did you have if any with Insp. Carl Holmes in 2007?
A. We were friendly. I actually met him right before the Police Academy. I met him during the agility test Rizzo rink. He knows my dad. He is a Detective Tom Lauf.

Q. Specifically, how were you summoned to his office?
A. I don't recall if it was a text message, a phone call or in person.

Q. Do you recall when this occurred?
A. I know I was transferred in Sept 2007 to the 9th District. I recall it was right around the time I was engaged. I got married 3-24-07, so it was between February and March of 2007.

Q. So this incident occurred prior to your marriage?
A. Yes.

Q. Did he make contact with you or call you or did you call him?
A. He made the initial contact.

Q. If so, what was your cell number and what was his cell number?
A. My number is still the same, I don't recall what his number was. My number #215-266-6874.

Q. Do you recall your cell phone provider at the time of this incident?
A. Verizon.

Signature of Det. Michele Vandegrift #755    *Det. Michele Vandegrift*

City303

APPENDIX 975

 

Q.  Were you working the street or inside on the night of this occurrence?
A.  That's a good question, I was working both on the street and inside at times, but I'm not sure.

Q.  Was anyone else around when you were asked to go to Holmes office?
A.  Initially when I was asked to go, No.

Q.  Can you explain what occurred to me?
A.  I walked into the inner office. He was right next to East Detectives. I came into his office, he approached me. He told me he wanted to know how wet I was. He then stuck his hand down my pants and underwear. He inserted his finger into my vagina. He pulled his hand out and tasted his finger and said it tasted good. I left. I said something like I'd better go and I left.

Q.  Did Holmes ask you for any type of sex or to perform any type of sexual act?
A.  No. I could smell alcohol on his breath. He was in plainclothes, I don't know what if any detail he might have been on.

Q.  What were you wearing on that day / night during the incident?
A.  A police uniform.

Q.  Exactly where in his office did this occur?
A.  I believe I was up against the wall or near the front door. I had not walked too far into his office when it occurred.

Q.  Did he push you up against a wall?
A.  I don't remember.

Q.  How long were you inside his office?
A.  Not long. Probably three to five minutes.

Q.  How long did the incident last, how long did he have his hand down your pants?
A.  Probably about a minute

Q.  Was there any type of conversation prior to him placing his hand down your pants?
A.  I don't remember, if there was a conversation, there wasn't much of a conversation. It all happened very quickly.

Q.  When Holmes did this to you, tell me what your direct reaction was?
A.  I was pretty much shocked, I just wanted to pretty much run out of there. I wanted to act like it didn't happen.

Q.  Can you explain how Holmes got his hands down your pants?
A.  It seemed like it happened so fast. I've been carrying this for a lot of years and it's tough and not easy. I had recently remembered something that I told Sgt. Linneman.

Signature of Det. Michele Vandegrift #755  _Det. Michele Vandegrift #755_

City304

 

When I came out of the office I recall seeing Det. Joseph Newbert. I recall seeing him and my face must have been red and I was upset. I saw Newbert look at me and he looked at me like, what was I doing coming out of Holmes office at that hour. He did not actually say that but his looked gave me that idea. He also looked like his expression was asking me if I was all right and then I walked into the bathroom.

Q. Go back to explain how Holmes got his hand down your pants past your clothes. What were you wearing exactly?
A. I wearing a police uniform. I don't recall if I was wearing a rig. I recall him unzipping my pants zipper. If I were working inside I would have just been wearing a garrison belt and gun, if I was outside I would have had on a rig. I believe he entered through the zipper of my pants. It's kind of fuzzy whether he took my belt off. My memory is of him unzipping and going on. His hands were pretty so I think that was rather difficult for him to do.

Q. Did her pull or aside your underwear prior to him inserting his finger into your vagina?
A. No he just pushed it aside.

Q. Again, what was your response or reaction to this occurring?
A. At that time it was going on I did not say anything to him.

Q. When you went into his office, Do you recall who if anyone was outside his office, a secretary or aid in an outer office?
A. It was the last out detectives, there was no aid at that time.

Q. Did you mention anything at all with anyone outside the office after the incident occurred?
A. No.

Q. Did you push him away?
A. No.

Q. Did Holmes try in any manner to force you to stay inside his office?
A. No.

Q. Did he ask you to stay in his office?
A. No.

Q. When you were first asked to go to his office, did you have any idea why would Insp. Carl Holmes ask you to come to his office?
A. I knew it wasn't business related. But at the same time I never thought that would happen.

Q. What did you think the reason was to call you to his office?
A. I just thought he wanted to talk on a personal level.

Signature of Det. Michele Vandegrift #755   _Det Michele Vandegrift #755_

City305




Q.  Is that something you had previously done with Holmes?
A.  I had never been to his office prior to this but I did have conversations with him.

Q.  Can you explain what type of conversation you had with him prior to this incident?
A.  I really don't remember what we talked about.  But when I came into his office he was smoking a cigarette at his desk.  I don't recall the conversation.  He used to call my phone and basically say sexual things to me.  He would talk to me about what he would do to me if we were together, like what he would do to me sexually.

Q.  How often did you have those types of conversations?
A.  I would say, I don't know the exact number.  I would say he called me at least three times prior to that night and have similar conversations with me.

Q.  Can you recall exactly what he would say during those conversations?
A.  Just dirty talk.  It was just basically dirty talk.  It was just like a description of sexual positions he pictured me in.  I remember one of the conversations he said "I would love to bend you over."  I recall he said that the most favorite part of a womans' body was the part between her hips to her thighs and that was the part that turned him on most.

Q.  When he said those things to you during those conversations, did you reply in any manner?
A.  Not really and I thought it was kind of funny and it stood out.  He would go on a tangent and I thought he was kind of crazy and I didn't really need to say anything for him to keep going.  It was really a one sided conversation he would talk and I would listen.

Q.  Did these conversations take place in person or by phone?
A.  By phone.

Q.  Do you recall if these conversations took place while you or he were working or off duty?
A.  I believe he was working and I was off-duty.  He would call me during the day and I was off and he worked during the day Monday through Friday.

Q.  Did you ever tell him to stop calling you?
A.  No.

Q.  Did you ever initiate a call in which you initiated some kind of dirty talking to him?
A.  No. It was he who initiated these types of calls.

Q.  Did you ever tell anyone at all about the calls you were receiving from Holmes?
A.  No.

Q.  Were you engaged at the time?
A.  Yes. I told my husband that we were talking but I did not tell him to the extent he was talking to me.

Signature of Det. Michele Vandegrift #755    _Det. Michele Vandegrift #755_

City306

APPENDIX 978

 

Q. Explain to me what kind of relationship you had with Insp. Carl Holmes?
A. Friendly.

Q. Were you ever involved in a sexual relationship with Insp. Carl Holmes?
A. No.

Q. Who is your husband?
A. William Vandegrift. He is assigned to the 3rd district.

Q. As of now does your husband know the full extent as to what Holmes had done to you?
A. Yes.

Q. You also previously stated that you told no one about what occurred to you inside Insp. Carl Holmes office. Why?
A. I felt like at the time I had no one to go to. If I went to my family they are on the job. I was a rookie police officer and felt like I could not go to anyone within the department. If I was to IAD I felt like I would be alienated by everyone at work if I had come here. I felt like I did not have a choice. Also given the position that Insp Holmes had, I couldn't go to my Captain. My captain at the time was Dave Mockus. Mostly I was afraid of any retaliation towards me and my family. I'm still afraid of some type of retaliation today.

Q. Did Insp. Carl Holmes ever make any mention to you about what he did that night afterwards?
A. He called my phone and I did not answer. I did not know how to tell him I was not interested and I let it go to voice mail. I just stopped talking with him. We never talked in person or by phone after that night. I do not believe I have seen him since that happened

Q. Did Insp. Carl Holmes ever directly ask you to have sex with him prior to this incident?
A. I cannot recall any direct comments.

Q. Did you ever make suggestion to have sex with him prior to this incident?
A. No.

Q. Was there any prior attempts by Holmes to touch you in any manner sexually?
A. No.

Q. again, are you sure you made mention of this incident to no one, either police department personnel or family or friends, therapist?
A. No, other than when I told Sgt. Linneman who was with Lt. Vales. It is also in the EEOC charge.

Q. Did Insp. Carl Holmes ever expose himself to you? If so when? Where?
A. No.

Signature of Det. Michele Vandegrift #755 _Det. Michele Vandegrift #755_

City307

 

Q. Did you ever go to any social events or police related events with Insp. Carl Holmes? If so when and where?
A. Yes. We actually met a bar one time prior to this incident. It was just the two of us. He invited me there. It was a bar on 2ⁿᵈ Street, he told me where it was but I don't know the exact location and I had never been there. It was a quiet bar, we sat at a table and we talked about a lot of things. I do not believe there was any sexual conversation that night, I don't know the name of the bar, he just gave me the location.

Q. Why did you meet him there by yourself?
A. I wanted to develop a friendship with him and I thought he could help me with my career and maybe he could help me work in the Inspector's office. My husband actually knew about it, it was no secret. I was fairly comfortable with him prior to that incident. I did not feel threatened. He did not act like the way he acted that night prior to that incident. I actually asked to be his aid or someone who works in his office.

Q. Did you ask him prior to the incident or after?
A. I believe I asked him at that bar which was prior to this incident.

Q. You mentioned that he spoke dirty to you on the phone, did you ever tell Holmes that you did not like him calling you or that you felt uncomfortable with his conversation? If so when?
A. No.

Q. I assumed from your previous interview and answers that you and Holmes spoke frequently by phone?
A. We had conversations that were not sexual in nature. Prior to him being assigned to East we did not have any conversations.

Q. Did Holmes suggest, directly or indirectly that if you had some type of sex with him that would help you get assigned to his office?
A. I would say indirectly. I mean if I had stopped paying attention to him or talking to him I felt as though I would lose the opportunity to possibly work in the Inspector's office or get transferred to a special unit.

Q. Would you say that when Insp Holmes put his hand down your pants and stuck his finger into your vagina, he did so without your consent?
A. Yes.

Q. Can you think of anything else concerning Insp. Holmes that we have not spoken about?
A. He did leave me a voice mail when my transfer went through to the 9ᵗʰ district. I went to him for something better than the 9ᵗʰ. I didn't mention to him that I had a transfer to the 9ᵗʰ, thinking it was not even a favor it was just a transfer. He also mentioned to me that he could not let me work in his office due to the other girls already in his office.

Break at 11:05am.  Return 11:08am
Signature of Det. Michele Vandegrift #755   *Det. Vandegrift #755*

City308

 

Q. Do you still have any voicemail you say your received from Holmes regarding your transfer?
A. No.

Q. Do you still have the same exact phone from 2007?
A. No.

Q. Do you have it in a drawer at home?
A. Possible.

Q. Can you look for the exact phone from the time period of the incident and if your find it supply it to me for a forensic analysis?
A. Yes, absolutely.

Q. Detective, you mentioned another incident involving P/O Joseph Davis. Can you explain to me what occurred and when this occurred?
A. I can give you a copy of my EEOC charge where I explained the incident. (Provided a copy of EEOC charge)

Q. What prompted him to expose himself to you?
A. He was comfortable with me and I think he was in a bad relationship at the time. I think he thought he had a chance with me. I really couldn't tell you what he was thinking.

Q. Did you ever have any type of physical or sexual relationship with P/O Davis, before or after this incident?
A. No.

Q. Did you respond to P/O Davis in any manner after he exposed himself to you?
A. I was shocked. I told him,"Oh my good Joe what are you doing.?" I told him I did not know what he was thinking, and I told him I was sorry if I made him thing he could do that. ~MV

Q. What if anything was there that you thought you did that would have given him the idea that he was comfortable in exposing his penis to you?
A. I remember thinking why would he think he could do that to me. What could I have possible down to make him think that would be welcomed.
MV

Q. Did you two work together for a time?
A. Yes. I would not say we were partners but for a period say a few months they had us working together. That was the 9th District.

Signature of Det. Michele Vandegrift #755   _Det. Michele Vandegrift #755_

City309



Q. Did either of you discuss any relationship possibility between the two of you during the time you worked together?
A. He had made it clear that he wanted to develop something with me. I remember him flirting with me a lot and he definitely gave me the impression he would leave his girlfriend to become involved with me. I recall telling him I was happily married.

Q. Do you have any idea when or where this occurred
A. It happened very early in the morning, like between 4am and 6am. A lot of times we would check Fairmount Park for vagrants or people drinking. I cannot say exactly where we were, other than somewhere within the 9th District. I do not recall what day or month.

Q. Did this occur inside your police vehicle?                    (anl sian) mv
A. Yes. I do not recall what car it was. It could have been 9T1. They did not have many 2 person vehicles, we were pretty active which was why we were together.

Q. Was there anything unusual or different about P/O Davis' penis?
A. No. it was hard.

Q. Was it scared or did it have any marks on it that you recall?
A. No.

Q. How long did he expose it to you for?
A. The same amount of time it took for me to say Oh my god Joe what are you doing. Because as soon as he got that reaction he zipped up.

Q. Did he say anything while exposing it to you?
A. No.

Q. Did he ask you to touch it, or perform any type of sexual act with him?
A. No he was just looking at it.

Q. Did you tell him you did not like that he exposed himself to you?
A. That's all I really said. We did not really speak afterwards and it was not much later we reported off.

Q. After the incident, did you continue to work along with him for the rest of the tour?
A. Yes until we reported off.

Q. Did you work with P/O Davis on the days after the incident?
A. I'm not one hundred percent sure about that. If we did not work together, it wasn't because I said something. If I had to say I think we did work together afterwards but I'm not sure.

Signature of Det. Michele Vandegrift #755 _____ Det. Michele VanDegrift #755

APPENDIX 982

City310



Q. Did you tell anyone about this incident?

A. No, not at the time. A couple of years later I told a friend, Ed Thompson. He is a Lieutenant as Central Detectives. I did not tell him as a notification to the police department. We were just having a conversation about sexual harassment in the department. Nothing he actually witnessed, but about friends of his who have mentioned incidents. He mentioned that he heard stories about one or two female's officers who have had penis pictures sent to them via phone.

Q. You told him what P/O Davis had done?

A. No, I left Davis' name out but I mentioned what happened.

Q. Did you ever have any sexual contact or a sexual relationship with P/O Joe Davis?

A. No.

Q. Have you spoken to anyone else who may have told you that P/O Davis had exposed himself to them?

A. No.

Q. Have you spoken to anyone else, who may have told you that, Insp Holmes had attempted to or suggested to touch them sexually or expose himself to them? *off cer (MV)*

A. Personally, I heard rumors that a Spanish female was forced to give him (Holmes) oral sex. It was sometime after what happened to me. It was two or three years after my incident. 2009 and after.

Q. Did anyone specifically threaten you not to say anything about these incidents?

A. No.

Q. When P/O Davis exposed his penis to you, was he doing anything to his penis when he exposed it?

A. I'm not a hundred percent sure, he may have been stroking it but I'm not sure. I just recall him when he unzipped he was sure to expose every part. He was holding it. That's all I really remember.

Q. Do you have anything you wish to add to this interview?

A. No. These incidents have affected me greatly, probably more than I realize. I have definitely gotten anxious and have anxiety over this. It has caused depression. I don't socialize with co-workers and stay with my family, This is also a result of the other incidents mentioned in my EEOC *Claim* *I'm withdrawn than I used to be. (MV)*

STATEMENT CONCLUDED: 12:38am.

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (   10   ) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: *Det. Michele VanDegrift* DATE: *12-12-14*   TIME: *12:15 PM*

SIGNATURE: *Sgt. Ray Heppen #163*   DATE: *12-12-14*   TIME: *12:15 PM*



| STATEMENT OF: | Det. Michele Vandegrift #755 |
| | PR #251357 |
| | Assignment: Southwest Detectives (detailed) |
| | Date of Appt: 5-03-04 |
| | Date of Assignment 9-05-14 |
| DATE AND TIME: | Friday, 12-19-14, @ 4:30 PM |
| PLACE: | 2534 Valley View Dr. |
| CONCERNING: | IAD # 14-1189 |

IN PRESENCE OF:

RECORDED BY:          Lt. Raymond Saggese #163.

I am Lt. Ray Saggese #163 of Internal Affairs, and I will be taking your statement. I have been assigned to investigate an allegation of sexual misconduct.

Q. Are you represented by counsel?
A. yes

Q. Have you had the opportunity to discuss this matter with your attorney?
A. yes

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes.

Q. Det. Vandergrift, you were previously interviewed by Sgt. Timothy Linneman #483 on 11-11-14. Would you consent to having a copy of your interview provided to me by Sgt. Linneman
A. Yes

Q. Would you also provide your consent for me to take possession of your cell phone, in order to have a Forensic Analysis conducted of the phone for information concerning this investigation?
A. yes

Signature of Det. Michele Vandegrift #755  Det. Michele V.

City312

APPENDIX 984



| | |
|---|---|
| STATEMENT OF: | Det. Joseph Newbert #8021 |
| | PR#223938 |
| | Assignment: East Detective Division |
| | Date of Appt: 1-22-96 |
| | Date of Assignment 12-16-98 |
| DATE AND TIME: | Wednesday, 1-07-15 @ 1:26 PM |
| PLACE: | Internal Affairs |
| | 7790 Dungan Rd. |
| CONCERNING: | IAD # 14-1189 |

**IN PRESENCE OF:**

**RECORDED BY:**        Lt. Raymond Saggese #163.

I am Lt. Ray Saggese #163 of Internal Affairs, and I will be taking your statement.

Q. Are you represented by counsel?
A. No.

Q. Do you wish to proceed with this investigation without a representative or attorney?
A. yes

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Signature of Det. Joseph Newbert #8021 _____

City313

APPENDIX 985

 

Q.  Det. Newbert, can you tell me what your current assignment is and how long have you been assigned there?
A.  I am assigned to East Division Detectives and have been there for 17 years.

Q.  Can you tell me if you know a female, Michele Vandegrift, formerly Michele Lauf?
A.  Yes

Q.  How do you know her?
A.  She used to work in the 24 th or 25th district

Q.  Were you ever assigned to work with her ?  If so when and where?
A.  No never.

Q.  How long have you known her and describe your relationship with her?
A.  I do not know, I know her from her being a police officer in the district and while I was assigned at East.

Q.  Were you assigned to East Detective Division in March of 2007?
A.  Yes.

Q.  Can you recall what squad or shift you were assigned to in March 2007?
A.  I was on last out for the last 15 years.

Q.  Can you tell me if Michele Vandegrift was assigned to East Division with you in March of 2007?
A.  No I do not believe she was.

Q.  Do you know Chief inspector Carl Holmes?
A.  I never met him.

Q. Did you ever work for him, was he your supervisor?
A. He was assigned as the east Division Inspector for a time, but I don't recall when.

Q. When Chief Holmes was in charge of EPD as Inspector in 2007, was his office located near your work area when you were assigned to EDD in March of 2007?
A. There is a long hallway and the Inspector's office was at one end.  I guess his office is about 100 feet away.

Q. Did his office and your work station at East Detectives, are they near each where you would see anyone coming and going from his office?
A. No.

Q. Can you recall ever seeing Michele Vandegrift / Lauf in the company of Carl Holmes? If so when and where?
A. No, never.
Signature of Det. Joseph Newbert #8021

APPENDIX 986

City314



Q. Can you recall if you ever saw Michele Vandegrift / Lauf walking into or leaving Insp. Holmes office in East Detective Division sometime in March of 2007 during your tour of duty?
A. No.

Q. Information received by me, indicated that on an unknown night in March 2007, sometime during the last out tour of duty, while you were working in east detectives, you saw Michele Vandegrift / Lauf leaving Insp. Holmes office, after an incident that may have been traumatic or worrisome for you to have seen. Can you recall any such incident?
A. No.

Q. Has Michelle Vandegrift ever spoken to you about Insp. Holmes?
A. No.

Q. Can you tell me if you ever saw any female police officers leaving Insp. Holmes office during your tour, which may have made you feel based on your experience as a detective, feel as though something was not right or that something unprofessional had occurred?
A. No.

Q. Do you have anything you wish to add to this interview?
A. No.

I am going to ask you not to mention this interview or its contents, questions, or your answers to anyone, as this is a confidential investigation.

STATEMENT CONCLUDED:      1:37pm

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (  3  ) PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: _____  DATE: _1-7-15_  TIME: _1:41p_

SIGNATURE: _____  DATE: _1-7-15_  TIME: _1:41_

City315

 

| | |
|---|---|
| **STATEMENT OF:** | Lt. Edward Thompson #264 |
| | PR#208637 |
| | Assignment: Central Detective Division |
| | Date of Appt: 7-03-90 |
| | Date of Assignment 9-02-10 |
| **DATE AND TIME:** | Thursday, 1-08-15 @ 11:00 AM |
| **PLACE:** | Internal Affairs |
| | 7790 Dungan Rd. |
| **CONCERNING:** | IAD # 14-1189 |
| **IN PRESENCE OF:** | |
| **RECORDED BY:** | Lt. Raymond Saggese #163. |

I am Lt. Ray Saggese #163 of Internal Affairs, and I will be taking your statement.

Q. Are you represented by counsel?
A. No.

Q. Do you wish to proceed with this investigation without a representative or attorney?
A. Yes

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes

Q. Are you willing to cooperate?
A. Yes

Signature of Lt. Edward Thompson #264 _Lt. Edward Thompson #264_

City316

APPENDIX 988

 

Q. Lt. Thompson, can you tell me what your current assignment is and how long have you been assigned there?
A. I am assigned to Central detective Division. I have been there since Sept of 2010.

Q. Can you tell me if you know a female, Michele Vandegrift, formerly Michele Lauf?
A. Yes.

Q. How do you know her?
A. I am friends with her brother Brian Lauf.

Q. Were you ever assigned to work with her? If so when and where?
A. No.

Q. How long have you known her and describe your relationship with her?
A. I've known her since maybe a year or so prior to my assignment to Central. Her brother Brian Lauf is a police officer in the 9th District, he introduced me to her.

Q. Where were you assigned prior to Sept 2010?
A. I was a Sergeant in Southwest Detectives and when promoted to Lieutenant I went to the 17th District.

Q. Where were you assigned in 2009?
A. I was assigned as a Lieutenant to the 17th between 2007 and 2009.

Q. Has Michele Vandegrift ever confided in you about work related issues or brought any work related problems to your attention in the past?
A. Yes, just like every day stuff, she did tell me about her EEO complaint. She only told me that she filed an EEO complaint and was detailed to Southwest Detectives. That was the extent of the conversation about her EEO. I did see her recently, she was a guest at my wedding on 10-05-14.

Q. Can you tell me if Michele Vandegrift ever reported to you that a male co-worker, whom she was assigned to work with, exposed his penis to her during their tour of duty?
A. No.

Q. Can you tell me if Michele Vandegrift ever reported to you any type of sexual assault of her, indecent exposure by a male co-worker to her to you?
A. No.

Q. Do you know Chief Inspector Carl Holmes?
A. I know of him but I do not know him personally. I do not know him socially and do not consider myself friends or an acquaintance of his, I just know him from police related affairs.

Signature of Lt. Edward Thompson #264     _Lt. Edward Thompson 264_

City317

APPENDIX 989

 

Q. Did you ever work for him, was he your supervisor?
A. No.

Q. Can you describe Michelle Vandegrift to me as a person?
A. I'd say she is a very sweet woman, confided in her at times, went to breakfast with her, but I never have been out with her outside work.

Q. Can you recall ever seeing Michele Vandegrift / Lauf in the company of Carl Holmes? If so when and where?
A. No never. I did not know she even knew him.

Q. Did she ever mention Carl Holmes to you ever and any relationship she may have had with her or anything he may have said or done to her?
A. No never. Like I said I did not know she even knew him.

Q. Did Michele Vandegrift / Lauf ever mention to you that while in uniform in the 9th District a co worker of hers had a crush on her and had made sexual advances on her while on duty and working
A. No.

Q. Do you have anything you wish to add to this interview?
A. No.


STATEMENT CONCLUDED:     11:29 AM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (  3  ) PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: _____  DATE: _1-7-15_  TIME: _11ᵒᵒ A_

SIGNATURE: _____  DATE: _1-8-15_  TIME: _11⁴⁰_

APPENDIX 990

City318

 

**STATEMENT OF:**      P/O Jacqueline Geiger # 3023
                       PR #223870
                       Assignment: Office of School Safety
                       Date of Appt: 1-22-96
                       Date of Assignment : 10-24-13

**DATE AND TIME:**     Friday, March 27, 2015 @ 10:42 am

**PLACE:**             Internal Affairs
                       7790 Dungan Rd.

**CONCERNING:**        IAD # 14-1189

**IN PRESENCE OF:**

**RECORDED BY:**       Lt. Ray A. Saggese #163.

I am Lt. Ray A. Saggese #163 of Internal Affairs, and I will be taking your statement.  I have been assigned to investigate an allegation of sexual misconduct.

Q.  Are you represented by counsel?
A.  No.

Q.  Do you wish to proceed with this interview without a representative?
A.  Yes.

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q.  Do you understand this?
A.  Yes.

Q.  Are you willing to cooperate?
A.  Yes.

Signature of P/O Jacqueline Geiger # 3023 _____

APPENDIX 991

City319

 

Q. P/O Geiger, tell me how long you have been assigned to the Office of School Safety?
A. I have been assigned there for the last two years.

Q. Explain to me the duties you perform?
A. I am Chief Inspector Holmes Aide.

Q. How long have you worked for him?
A. I have worked as his aide for the last 12 years.

Q. During that time, do you usually work when he works?
A. Yes.

Q. Would that include night work?
A. My normal schedule is 7a to 3p. However, if there is a detail, I would work whatever the detail required, which may be into the night.

Q. Can you tell me where you were assigned during 2007?
A. East Police Division

Q. Were you Chief Inspector's Homes aide then as well?
A. Yes.

Q. Do you know Police Officer Michelle Lauf, now Detective Michelle Vandergrift? How long have you known her?
A. I've seen her around the district. We worked the 24th District together. She was assigned to the 24th District and I was assigned to the 24th District but I was detailed to C/I Holmes office as his aide.

Q. Can you tell anything about what you may know of or recall of Police Officer Michelle Lauf, now Vandergrift from 2007?
A. I've seen her around the district. I have seen her in the 24th District and seemed to be flirting with several of the males in the 24th.

Q. Explain?
A. I saw her at one point touching one of the male officers, hugging him. She was known to be friendly with a lot of the male officers.

Q. Did you know her to have a relationship with any of the officers?
A. No I did not.

Q. Have you ever socialized off –duty with Michelle Lauf-Vandergrift while she was a police officer assigned to the 24th District in or about 2007?
A. No.

Signature of P/O Jacqueline Geiger # 3023    _X Jacqueline Geiger_

City320

APPENDIX 992

 

Q. Was there any type of reputation attached to her?
A. No I can not say.

Q. How well do you know Chief Inspector Holmes?
A. Pretty well.

Q. Do you socialize off duty with Chief Inspector Holmes?
A. Yes.

Q. When you say pretty well, can you be more specific?
A. I know his immediate family personally, his wife, children and his parents and siblings. I have been to family functions at his parent's house and I went to his wedding.

Q. Did you ever see Michelle Lauf Vandergrift with Chief Inspector Holmes ever?
A. No never.

Q. Ever take a phone call from her for C/I Holmes?
A. I don't recall Iever talking to her over the phone.

Q. Did Chief Holmes ever ask you to call her for him?
A. No.

Q. During 2007, did you ever see Michelle Lauf Vandergrift with Chief Inspector Holmes in his office at East Police Division which is near the Detective Division?
A. No never.

Q. Would you ever have worked after midnight back in 2007 with Chief Holmes?
A. Only on special event days such as the Puerto Rican day Parade and the Greek Picnic, other than that no never.

Q. Did Chief Inspector Holmes ever tell you anything about Michelle Lauf Vandergrift during any conversation?
A. No.

Q. Did Chief Inspector Holmes ever mention anything occurred sexually with Michelle Lauf Vandergrift?
A. No.

Q. As a female working for Chief Inspector Holmes, has he ever suggested anything of a sexual nature to you or talked unprofessionally in the workplace about the subject of sex to you?
A. For the 12 years I've known him I can honestly say he has never said anything inappropriate to me.

Signature of P/O Jacqueline Geiger # 3023 X _Jacqueline Geiger_

City321

Q. Did you hear anyone talking (rumors)about any type of relationship between Lauf and the Chief?
A. No, never.

Q. Do you have anything you wish to add to this interview?
A. No.


STATEMENT CONCLUDED:   11:01 AM.

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (   4   ) PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: _____ DATE: 3-27-15 TIME: 11:05 AM

SIGNATURE: _____ DATE: 3-27-15 TIME: 11:05

City322

 

| | |
|---|---|
| **STATEMENT OF:** | Officer Joseph Davis #5310 |
| | PR #263764 |
| | Assignment: 9th District / 5B |
| | Date of Appt: 12-17-07 |
| | Date of Assignment 10-13-08 |
| **DATE AND TIME:** | Tuesday, March 10, 2015 @ 3:30pm |
| **PLACE:** | Internal Affairs |
| | 7790 Dungan Rd. |
| **CONCERNING:** | IAD # 14-1189 |
| **IN PRESENCE OF:** | Danielle Nitti, Esquire. |
| **RECORDED BY:** | Lt. Raymond Saggese #163. |

I am Lt. Ray Saggese #163 of Internal Affairs, and I will be taking your statement. I have been assigned to investigate an allegation of sexual misconduct.

Q. Are you represented by counsel?
A. Yes.

Q. Have you had the opportunity to discuss this matter with your attorney?
A. Yes.

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Signature of Officer Joseph Davis #5310 _____ #5310

City323

APPENDIX 995

 

Q. Officer Davis, tell me how long you have been assigned to the 9TH District?
A. I have been assigned to the 9th since 10-13-08

Q. Were you married or in a relationship with anyone in 2009?
A. I was not married and I do not remember dating anyone steadily.

Q. Did you ever work with Detective Michelle Vandergrift , who held the rank of police officer in 2009?
A. Yes

Q. How much did you work with her? ie....steady partners, couple of times a week, for how long ?
A. My best summation is maybe we worked one to two nights a weeks for several months.

Q. Have you socialized with Michelle Vandergrift previously?
A. I never went out with her socially in a group or alone.

Q. Did you ever confide in Michelle Vandergrift about your personal life?
A. When we worked together, of course we spoke about our personal lives, but nothing major comes to my mind.

Q. Did you confide in her about a girlfriend at the time and the trouble of having sex with her?
A. No.

Q. Did you ever date or have any type of relationship with Michelle Vandergrift? When and how?
A. No.

Q. Did you ever ask Michelle Vandergrift to have a relationship with you? When and how?
A. No.

Q. Did you suggest to Michelle Vandergrift about having sex with her in any manner? When and how?
A. No.

Q. Ever make any gestures towards Michelle Vandergrift / her in reference to having sex with her? When and how?
A. No.

Q. Did Michelle Vandergrift ever suggest having a relationship with you? When and how?
A. No.

Q. Did you ever have sex of any type with Michelle Vandergrift ? On or off duty?
A. No.

Signature of Officer Joseph Davis #5310 _____ #5310

City324

 

Q. Did she ever expose herself to you? On or off duty? Explain?
A. No.

Q. Did you ever touch Michelle Vandergrift's breasts, buttocks or private parts?
A. No.

Q. Did you expose your penis to Michelle Vandergrift sometime in 2009 while working?
A. No.

Q. Describe your penis to me, are there any markings, scars, pimples, birthmarks abnormalities about your penis that you can tell me?
A. There is nothing unusual.

Q. Did you ask Michelle Vandergrift to touch or do anything to your penis ever?
A. No.

Q. Did you ever want to have a relationship with her or express that you wanted a relationship with her?
A. No.

Q. Was that topic ever discussed by the two of you while either working or off-duty?
A. No.

Q. Why would Michelle Vandergrift allege you exposed yourself (your penis) to her while working in a patrol car together in 2009?
A. I can say I have no idea why she would make up that type of allegation.

Q. Did you ever hear about this allegation previously?
A. No.

Q. Was there any reason to have stopped working with her?
A. I believe she went to day work.

Q. Were there any issues like a fight or disagreement that caused you two to stop working together?
A. No.

Q. Did either of you discuss any relationship possibility between the two of you during the time you worked together?
A. No.

Signature of Officer Joseph Davis #5310 _____ _#5310_

City325

 

Q. Have you seen Michelle Vandergrift since you stopped working with her and if so did this subject ever get mentioned between the two of you?
A.   Yes I have seen her several times on the job throughout the years since she was promoted. Actually the only place I saw her was court. We said hello, participated in small talk that was it.  She never gave me any indication that she had an issue with me.

Q.  During the times you worked with Michelle Vandergrift, did she ever mention being friends with Chief Inspector Carl Holmes, whom I believe was an Inspector during or around 2009?
A. No.

Q.  Did Michelle Vandergrift ever tell you she had or wanted to have a relationship of any kind with Insp. Holmes? Describe or Explain
A.  No.

Q.  Did she ever tell you he wanted to have a relationship with her? Describe or Explain?
A.  No.

Q.  Did Michelle Vandergrift ever tell you that Holmes touched her sexually at any time?? Explain?
A. No.

Q.  Did Michelle Vandergrift ever mention to you that she was sexually assaulted by anyone in the department and may not have revealed the name of the perpetrator? Explain?
A.  No.

Q.  Do you have anything you wish to add to this interview?
A.  No.

STATEMENT CONCLUDED:     4:01pm

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (   4   ) PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE:_____     DATE: _3-10-15_   TIME: _4:06 p_

SIGNATURE:_____     DATE: _3-10-15_   TIME: _4:06 p_

 

| | |
|---|---|
| **STATEMENT OF:** | Chief Inspector Carl Holmes |
| | PR #206865 |
| | Assignment: Office of School Safety |
| | Date of Appt: 3-26-90 |
| | Date of Assignment : 10-24-13 |
| **DATE AND TIME:** | Wednesday, March 18, 2015 |
| **PLACE:** | Internal Affairs |
| | 7790 Dungan Rd. |
| **CONCERNING:** | IAD # 14-1189 |
| **IN PRESENCE OF:** | Captain Charles Vogt #115 |
| | Timothy Strange, Esquire. |
| **RECORDED BY:** | Lt. Ray A. Saggese #163. |

I am Lt. Ray A. Saggese #163 of Internal Affairs, and I will be taking your statement.  I have been assigned to investigate an allegation of sexual misconduct.

Q.  Are you represented by counsel?
A.  Yes.

Q.  Have you had the opportunity to discuss this matter with your attorney?
A.  Yes

You are reminded, that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-008-10 of the Disciplinary Code.

You are also reminded, that lying or attempting to deceive regarding material fact in response to an official Departmental investigation is punishable by dismissal under Article 1-009-10 of the Disciplinary Code.

Q.  Do you understand this?
A.  Yes.

Q.  Are you willing to cooperate?
A.  Yes.

Signature of Chief Inspector Carl Holmes _____

City327

APPENDIX 999

 

Q. Chief Inspector Carl Holmes, tell me how long you have been assigned to the Office of School Safety?
A. Since October of 2013.

Q. Can you tell me where you were assigned during 2007?
A. I believe in 2007, I was the divisional commander of East Division located at 3901 Whitaker Ave.

Q. Were you married or in a relationship with anyone in 2007?
A. I've been married since 2004.

Q. Do you know Police Officer Michelle Lauf, now Detective Michelle Vandergrift? How have you known her?
A. Yes. I've known her since she went through the Police Academy.

Q. Do you know her father Det. Thomas Lauf? How?
A. Yes, since I was a cop in North Central during the early 1990's.

Q. Can you tell me how you met then Police Officer Michelle Lauf, now Vandergrift?
A. Actually I was an Inspector in the police academy when she went through. I believe I took a picture with her and her father on her graduation day.

Q. Have you ever socialized off–duty with Michelle Lauf-Vandergrift while she was a police officer assigned to the 24th District in or about 2007?
A. I may have been at the same party as she attended or in bars she may have been in, or some social setting. There is a bar called Liberties frequented by police and District Attorney's where I may have seen her present. I used to see a lot of younger police of-duty officers in that bar.

Q. Did you go to that bar, to meet with Michelle Lauf-Vandergrift specifically, meaning just the two of you?
A. Not that I recall.

Q. Did you ever confide in Michelle Lauf - Vandergrift about your personal life during the 2007 period?
A. No.

Q. Did you ever date or have any type of relationship with Michelle Lauf Vandergrift? When and how?
A. No.

Q. Did you ever ask Michelle Lauf -Vandergrift to have a relationship with you? When and how?
A. No.

Signature of Chief Inspector Carl Holmes _____

City328

 

Q. Did you suggest having sex with Michelle Lauf-Vandergrift in any manner? When and how?
A. No.

Q. Ever make any gestures towards Michelle Lauf-Vandergrift / her in reference to having sex with her? When and how?
A. No.

Q. Did Michelle Lauf-Vandergrift ever suggest having a relationship with you? When and how?
A. No.

Q. Did you ever have sex of any type with Lauf-Michelle Vandergrift? On or off duty?
A. No.

Q. Did she ever expose herself to you? On or off duty? Explain?
A. No.

Q. Did you ever touch Michelle Lauf-Vandergrift's breasts, buttocks or private parts?
A. No.

Q. Are there any markings, scars, pimples, birthmarks abnormalities on your penis that you can tell me?
A. No.

Q. Did you ever ask Michelle Lauf-Vandergrift to touch or do anything to your penis?
A. No.

Q. Did you ever have any type of physical or sexual relationship with Michelle Lauf-Vandergrift?
A. No.

Q. Did either of you discuss any relationship possibility between the two of you during the time she was assigned to the 24th District in 2007?
A. No.

Q. Did you ever suggest to Michelle Lauf-Vandergrift that as East Division Inspector, you could get her transferred to where she wanted to go, such as a more desirable assignment?
A. No.

Q. Did you promise to help her get a more desirable assignment if she performed some type of sex with you in exchange for a transfer?
A. No.

Q. Did Michelle Lauf-Vandergrift ever ask you for any special favors as far desirable assignments?
A. No.

Signature of Chief Inspector Carl Holmes _____

 

Q. What is your cell phone number?
A. It is 267-438-7118

Q. How long have you had that number?
A. Since we were issued City cell phones in 2008.

Q. Did you have that number in March 2007?
A. No. We believe we were issued Blackberries in 2008, prior to that we had beepers.

Break 1:55PM
Returned 1:57PM

Q. Did you have a private cell phone number in 2007 and if so what was the number and carrier?
A. My personal cell phone number is 267-872-2221 I believe its AT&T. I've had it a long time.

Q. Did you have the same phone in March 2007?
A. Yes. I believe I had this number back in 2007.

Q. Did you ever call Michelle Lauf-Vandergrift ?
A. I do not specifically recall, it is possible.

Q. Would you have had any job related reason to have called her?
A. Its possible, I just do not remember.

Q. Did she ever work directly for you?
A. No.

Q. If Michelle Lauf-Vandergrift alleged that you called her a lot especially in 2007, would you recall if you had done so?
A. No.

Q. She provided me with her cell phone and cell phone records in reference to this investigation, and her allegations against you, and was adamant that you repeatedly called her, do you have any idea why would she allege that?
A. I do not know. I do not recall, I may have called a lot of people back then. I hung out a little more then, I was younger, I would hang at Northern Liberties and other social places within the city, in my off-duty hours. I had one child back then who was a toddler and now I have two school children so life and times change. My social habits have changed. I really can't remember who I may or may not have called in 2007.

Q. If you did call her as alleged, would you have talked to her about sexually related subjects?
A. No.

Signature of Chief Inspector Carl Holmes

City330

APPENDIX 1002

 

Q. Do you recall having any type of social acquaintance with Michelle Lauf-Vandergrift at all in which you would have discussed sexually related habits or desires?
A. No.

Q. Would you have any idea why Michelle Lauf-Vandergrift would allege you called her repeatedly to speak with her about the sexual things you wanted to do to her?

Break 2:10Pm
Returned 2:15Pm

A. I did not do that, secondly, if the question is why she would allege this, I believe this is two fold, One- I think she is looking for some kind of litigation against the department or city. Two I am a visible target who has had unfavorable press and had very public disciplinary action taken against me in 2008. I was passed over for Chief and demoted.

Q. Was Michelle Lauf-Vandergrift ever inside your office in East Division?
A. I do not know. It is possible.

Q. Were you and she ever in your office alone together?
A. Not that I recall.

Q. Sometime in March 2007, did you request Michelle Lauf-Vandergrift to come to your office in East Division late at night?
A. No.

Q. Michelle Lauf-Vandergrift alleged that on a night in March 2007, you called her to your office, unzipped her pants, slide aside her panties and inserted your finger (s) into her vagina. Did this incident occur?
A. No.

Q. Did you ever have any type of conversation with her in which you told her, her vagina was wet?
A. No.

Q. Did you have anything to do with her getting transferred in to the 9th District in September 2007?
A. No.

Q. Can you provide any explanation or reasons as to why Michelle Lauf-Vandergrift would allege you sexually assaulted her back in March of 2007?
A. No.

Q. Can you tell me who your aide(s) were in or about March 2007?
A. Jackie Geiger. She still is my aide.
Signature of Chief Inspector Carl Holmes

City331

 

Q.  Why do you think you have been the subject of such similar allegations involving women during your career?
A.  Basically because of what happened to me in 2008, I have become easy fodder I believe. Especially for people with whom I've had no contact with for years.

Q. Do you have anything you wish to add to this interview?
A.  Yes.  I understand as a licensed attorney in the Commonwealth of PA since 2003, that government entities must investigate allegations of misconduct.  However, I am urging this process to understand that when they take allegations of misconduct that are six, seven eight years old in some cases with the same theme, with particular allegations against a commander such as myself and further when these allegations in several instances have proven to be false and malicious, I would ask that IAD take all due care and consideration prior to disrupting both, my professional and personal life with such patently false allegations.  Lastly, the chronology of these allegations, defy all logic.  Considering in the intervening years, while I was under a very visible active investigation in 2008, and under very scrutinous observation by the Press in 2012, if true, these allegations most likely would have been brought to light back then.  With that I close my statement formally.


STATEMENT CONCLUDED:  2:33PM.

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (   6   ) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: _____   DATE: 3-25-2015   TIME: 2:54 PM

SIGNATURE: St. Ray D Pepen #163   DATE: 3.25.15   TIME: 2:54pm

City332

 

GENERAL:7285 12/22/14 16:58:11 FROM IA2C TO DS02 RECEIPT NO:944. PAGE 1 OF 2
FORM 75/48 - PAGE 1
YEAR 14 DIST/OCC 02 DC NO 77839  SECT _ DIST    VEH NO      DATE 122214  COD
CRIME/INCIDENT CLASS INVEST OBJECT          CODE 3116 TIME: OUT 1600   IN
LOCATION OF OCCUR 7790 DUNGAN RD        INSIDE-1 OUTSIDE-2 1  TYPE/PREM
COMPLAINANT CONFIDENTIAL            · PHONE: HOME    BUS
ADDRESS CONFIDENTIAL                          AGE      RACE      SEX
DATE OF OCC 121914 TIME OF OCC 1600 INJURY N/A NATURE OF INJURY N/A
FOUNDED YES REPORT TO FOLLOW YES      UNIT IAD  CODE 98 INV. CONT. NO 141189
WITNESSES NO  TRACEABLE PROPERTY YES  DESC OF OFFENDER YES OTHER EVIDENCE NO
DESCRIPTION OF INCIDENT (INCLUDE DESCRIPTION OF CRIME SCENE IF APPLICABLE):
PLEASE OBTAIN A SET OF DISTRICT CONTROL NUMBERS AND CONTACT LT RAY SAGGESE
AT IAD AT 215-685-5025.  REFER TO IAD CONTROL # 14-1189


WITNESS                ADDRESS                    PHONE
WITNESS                ADDRESS                    PHONE
OFFENDER INFORMATION

(CONTINUED ON PAGE 2)

GENERAL:7285 12/22/14 16:58:11 FROM IA2C TO DS02 RECEIPT NO:944. PAGE 2 OF 2
FORM 75/48 - PAGE 2
YEAR 14 DIST/OCC 02 DC NO 77839
PROPERTY DESCRIPTION: STOLEN      DAMAGED      INSURED      TOTAL VALUE


PLEASE OBTAIN A SET OF DC NUMBERS AND CONTACT LT RAY A SAGGESE #163 AT IAD
AT 685-5025
WANTED/STOLEN MESSAGE: GEN      DATE         DIST/UNIT TERM     RECEIPT NO
                         SENT BY                     BADGE
REPORT PREPARED BY: LT RAY A SAGGESE 191039   BADGE 163  DIST/UNIT IAD
REPORT REVIEWED BY:                    BADGE      DIST/UNIT
REFERRAL DATE         GENERAL NUMBER


POLICE OFFICER SENDING REPORT LT RAY A SAGGESE      BADGE 163  DIST/UNIT IAD


City333

APPENDIX 1005

 

| AMENDED CHARGE OF DISCRIMINATION | AGENCY<br>Q FEPA<br>X EEOC | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974: See privacy statement before consolidating this form. | | |

STATE OR LOCAL AGENCY: Pennsylvania Human Relations Commission

| NAME (Indicate Mr., Ms., Mrs.)<br>Michele Vandegrift | HOME TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP<br>Huntingdon Valley, PA 19006 | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>City of Philadelphia | NUMBER OF EMPLOYEES, MEMBERS<br>>15 | TELEPHONE (Include Area Code)<br>(215) 686-3013 |
|---|---|---|

| STREET ADDRESS<br>Headquarters<br>750 Race Street | CITY, STATE AND ZIP<br>Philadelphia, PA 19106 | COUNTY<br>Philadelphia |
|---|---|---|

| CAUSE OF DISCRIMINATION (Check appropriate box(es))<br>Q Race  Q Color  X Sex  Q Religion  Q National Origin<br>X Retaliation  Q Age  Q Disability  Q Other (Specify) | DATE DISCRIMINATION TOOK PLACE<br><br>Earliest          Latest<br><br>Continuing violation |
|---|---|

The Particulars Are:

A. 1. Relevant Work History

I was hired by Respondent in or about May 2004 as a Police Officer. I worked in various districts within Respondent until I was promoted to Detective in or around December 2011. At that time, I was transferred to the South Division. As of in or around January 2014, I reported directly to Lieutenant Anthony LaSalle (male), who reported to Captain Martin Derbyshire (male). Captain Derbyshire currently reports to Inspector Anthony Washington (male).

South Division is composed of four (4) squads, called "1 squad," "2 squad," "3 squad," and, "5 squad." As of about November 2013, I was assigned to 3 squad, along with Sergeant Maurice Black (male); Sergeant Maurice Hampton (male); Detective John Ruth (male); Detective Andrew Jackson (male); Detective John Frei (male); Detective James Priadka (male); Detective Neal Aitken (male); Detective Steve Haraszkiewicz (male); Detective Donnell Hobbs (male); and, Detective Kevin Conaway (male).

I have consistently demonstrated excellent performance and dedication to Respondent.

| X I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements)<br><br>I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
|---|---|
| I declare under penalty or perjury that the foregoing is true and correct.<br><br>*Michele Vandegrift*<br>Date: 10-26-14   Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |

City334

EEOC Charge of Discrimination
Page 2 of 6
Initials of Charging Party – $MV$

2.   Harm Summary

The work environment at Respondent is one of pervasive sex discrimination and retaliation.  I have been discriminated against because of my sex.  I have also been, and continue to be, retaliated against based on my complaints about the same.  Evidence of the discriminatory and retaliatory conduct to which I have been subjected includes, but is not limited to, the following:

(a)   In or around 2007, Carl Holmes, Inspector (male), who was in my chain of command, told me to come up to his office.  When I went in, I was standing against the wall when he approached me and said, "I want to know how wet you are."  He stuck his hand down my pants and my underwear, inserted his finger in my vagina, pulled his hand out of my pants and tasted his finger.  I immediately said that I had to go and left his office;

(b)   In or around 2009, I was on patrol with Officer Joe Davis (male).  After telling me that his girlfriend's vagina was too small and it hurt his penis when he had sex with her, he suddenly pulled down the zipper of his pants and exposed himself;

(c)   In or around 2007, I came in to work and my face was sunburned.  Sergeant Al Corson (male) asked me if I got my sunburn while engaging in "roadhead" with my then-fiance.  "Roadhead" refers to a woman giving a man oral sex while he is driving;

(d)   In or around 2011, Sergeant John Wood (male), and my direct supervisor at the time, was talking to me about a rumor that a female police officer was having an affair with a (higher level, male) Sergeant in our squad.  In the middle of that conversation, Sergeant Wood said, "No man would ever turn down a blow job."  I understood Sergeant Wood's comment to mean that he wanted me to offer to give him a blow job and that he would accept the same;

(e)   In or around 2009, a male supervisor-level employee told me that the squad in which I worked at the time thought that I was "fucking" Sergeant Thomas Tamulis (male), my then-supervisor;

(f)   In or around 2010, I was walking to the women's locker room when Officer Luis Santiago (male) came out of the men's locker room.  He made sure to stop and check that I was looking at him, and then he started zipping up his pants.  When I told him not to ever do that again, he rolled his eyes and said, "whatever;"

(g)   On or about August 7, 2014, Detective Ruth sent me and several of my (male) colleagues a text message.  The text stated, "Does anyone recognize this girl with [Captain] Larry Nodiff (Whiskey Harry/white hook)?"  Attached to the text message was a picture of Jerry Jones, the owner of the Dallas Cowboys football team, pushing a woman's head into his crotch.  The woman in the picture looked like me.  Captain Nodiff worked in South Division until his promotion in or around January 2014, when Captain Derbyshire was transferred into that position;

(h)   I am aware that Mr. Jones is recently sued by a stripper who accused him of sexually assaulting her, including groping her genitals, making her rub his penis, and forcing her to watch as he received oral sex from a different woman.  The woman who brought the lawsuit alleged that she took pictures of Mr. Jones with other women, including the picture that Detective Ruth sent;

City335

 

EEOC Charge of Discrimination
Page 3 of 6
Initials of Charging Party – ᴍ✔

(i)    In response to Detective Ruth's text message, Detective Neal Aitken (male) replied to everyone on the text, "Yeah, yeah. She looks familiar. Yeah yeah I think I've got it." As my colleagues are well aware, I frequently say, "yeah yeah" in conversation;

(j)    On or about August 16, 2014, Sergeant Black asked if anyone had Lieutenant LaSalle's phone number. When I said yes, and handed him my phone so that he could use it to call Lieutenant LaSalle, Sergeant Black said, "hold up, he's not going to answer the phone and say, hey baby?" The other (male) detectives who were in the room started laughing;

(k)    On or about July 28, 2014, I was walking to court when I saw Detective Ruth and Detective Priadka. Detective Ruth looked at my chest and said, "What, are you trying to show off your cleavage today?" He then laughed and punched me in the arm. Detective Priadka then looked at my chest and laughed;

(l)    My male colleagues have told me that I should take it as a compliment when they, and other males, stare at me;

(m)    Detective Ruth keeps a large coffee mug on his desk on which he painted, in white-out, "Get Off My Dick";

(n)    On or about June 25, 2014, Detective Ruth asked me if I went anywhere good on my recent vacation. When I told him that we went to Ocean City, Detective Ruth responded that he thought I went to "Hedonism." I understood Detective Ruth's reference to Hedonism to be regarding a vacation spot in Jamaica that is known to be sexually wild and a destination for nudists and swingers. When I told Detective Ruth that I would never go there for vacation, as I was married with a baby, he said that that was an "even better reason to go";

(o)    Detective Haraszkiewicz told me that, when he feels badly about what kind of detective he is, he just thinks of me and says to himself, "If she can do it, I can do it because, I mean really, Michele, what kind of detective are you;"

(p)    Upon information and belief, male detectives responsible for assigning work when it comes in favor the males regarding the same by giving them more complex complaints that warrant overtime. I complained to Lieutenant LaSalle regarding the same, including that the male detectives did not respect me because I am female. I also complained that the male detectives spread rumors that I am in a sexual relationship with him;

(q)    In response to my complaint, Lieutenant LaSalle told me that he was unable to say something directly to the male detectives regarding my complaint because it would look like he was sticking up for me. He told me to direct my complaints to Sergeant Black and/or Sergeant Hampton;

(r)    Upon information and belief, Detective Ruth sent a text message to my male colleagues including a picture of an elderly woman holding a retired detective badge and he wrote in the text, "I'd rather have her for a partner than Michele";

(s)    While I was at the firing range at the Police Academy for mandatory training, I was unloading my firearm in front of a group of male police officers, who, as soon as they noticed me, started staring at me. One of the officers asked me if I needed help "unloading," in a suggestive tone;

APPENDIX 1008

City336

 

EEOC Charge of Discrimination
Page 4 of 6
Initials of Charging Party – MV

(t)     On or about August 26, 2014, I went to Respondent's Employee Assistance
        Program ("EAP"), as I was extremely upset and stressed regarding the sexist,
        degrading conduct to which I was being, and had been, subjected. The advice of
        the EAP counselor was to tell my male colleagues to "knock it off." I was also
        told by the EAP to just let my Captain handle the situation, rather than me filing a
        complaint against Respondent;

(u)     After I left my session at Respondent's EAP, I made a complaint with the Equal
        Employment Opportunity ("EEO") unit of Respondent's Internal Affairs Bureau
        ("IAB") regarding the sex discriminatory conduct to which I was being subjected;

(v)     Upon leaving Respondent's IAB, I contacted Captain Derbyshire and informed
        him that I had just filed an EEO complaint. Captain Derbyshire, who sounded
        annoyed with me, asked me for a quick description regarding the basis for the
        same, and then told me that he had a meeting and would call me back. Although
        I told Captain Derbyshire that I did not feel comfortable continuing to work in my
        squad with male colleagues who were engaging in sex discriminatory conduct,
        he did not get back to me;

(w)     On or about August 26, 2014, I contacted my union to advise them of my EEO
        complaint that I filed with IAB, and they said that I should file a complaint with the
        EEOC, as Respondent was not taking my complaints seriously;

(x)     When the union contacted Captain Derbyshire to ask how Respondent was going
        to handle my complaint, as I was not comfortable continuing to work in my squad
        with my male colleagues who harassed me, he said that I could transfer into 1
        squad or 2 squad. I chose 2 squad, as I had previously worked in that squad and
        get along well with the detectives;

(y)     Upon my transfer to 2 squad, Detective Bob Kerwin (male) told me that, "You
        would not believe what the [3] squad is saying about you. They told me not to
        talk to you because you were fucking the lieutenant [LaSalle] on last out and that
        you back-stabbed him by making a complaint about him." "Last out" refers to the
        12am-8am shift, which I worked until my transfer to 2 squad. Detective Kerwin
        also told me that the 3 squad detectives were saying that I could not be trusted
        because of my complaint;

(z)     Upon my transfer to 2 squad, I was ignored and treated with hostility by the same
        (male) colleagues with whom I had worked previously and with whom I had
        gotten along very well;

(aa)    I informed Lieutenant Christopher Morton (male), supervisor of 2 squad, about
        Detective Kerwin's comments. His only response was that he did not think that
        he had a solution to the problem, and that he would speak with Captain
        Derbyshire;

(bb)    On or about August 27, 2014, I filed a Charge of Discrimination with the EEOC
        regarding the sex discriminatory conduct to which I was being subjected;

City337




EEOC Charge of Discrimination
Page 5 of 6
Initials of Charging Party – MV

(cc) On or about September 5, 2014, Respondent informed me that I was being transferred to the Southwest Division. That division is generally perceived by police officers and detectives to be the worst division in which to work, as it is extremely busy and extremely hectic. The Southwest Division is also further from my home than the South Division. The Southwest Division is well-known as the location to which officers and detectives who are in trouble or who have engaged in misconduct are sent as a punitive measure;

(dd) When I asked the reason for my transfer, I was told that it was best for my "protection" to be moved out of South Division. I was immediately escorted out of the building;

(ee) When I informed IAB that I was being transferred, involuntarily, to the Southwest Division, I was told that Respondent was taking such action because it was easier to transfer me than all of the (male) employees about whom I was complaining. I was also told that the investigation into my complaints would probably be concluded after Christmas 2014; and,

(ff) Respondents' demographics evidence a bias against females. Evidence of this includes, but is not limited to, the following:

(1) Out of approximately fifty (50) detectives in South Division, only about six (6) are female;

(2) I was the only female in 3 squad in South Division;

(3) Upon information and belief, there has not been a female Captain in South Division for at least approximately fifteen (15) years;

(4) Since my transfer into South Division, around December 2011, there has been only one (1) female Lieutenant, who was promoted into the position in or around January 2014; and,

(5) In over ten (10) years of employment with Respondent, I have never had a female direct supervisor.

B.  1.  Respondent's Stated Reasons

(a) Respondent has not offered any explanation for the hostile work environment based on my sex and my complaints about the discriminatory treatment to which I have been subjected;

(b) Respondent has not offered any explanation for the retaliation to which I have been subjected, including being transferred to a less desirable location; and,

(c) Respondent has not offered any explanation for its pattern and practice of discriminating against female employees, including subjecting them to a hostile work environment.

City338

 

EEOC Charge of Discrimination
Page 6 of 6
Initials of Charging Party – *MV*

C.    1.    Statutes and Basis for Allegations

I believe that Respondent has discriminated against me and subjected me to a hostile work environment based on my sex and retaliated against me based on my complaints about the same in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, *et seq.* ("PHRA"), as set forth herein.

D.    1.    Class Harm

I bring this charge on a class basis as a result of the pattern and practice of sex discrimination and a hostile work environment existing at Respondent.  Accordingly, I file this as a class charge on behalf of all female employees of Respondent that have been subjected to discrimination and a hostile work environment while employed at Respondent.

APPENDIX 1011

City339

 

INFORMATION FOR COMPLAINANTS & ELECTION OPTION
TO DUAL FILE WITH THE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Michele Vandegrift v. City of Philadelphia

EEOC No. _____

You have the right to file this charge of discrimination with the Pennsylvania Human Relations
Commission (PHRC) under the Pennsylvania Human Relations Act. Filing your charge with PHRC
protects your state rights, especially since there may be circumstances in which state and federal laws
and procedures vary in a manner which would affect the outcome of your case.

Complaints filed with the PHRC must be filed within 180 days of the act(s) which you believe are
unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be
dismissed.

If you want your charge filed with the PHRC, including this form as part of your EEOC charge, with
your signature under the verification below, will constitute filing with the PHRC. You have chosen
EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept
EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to
file a request for preliminary hearing with PHRC.

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency,
the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is
required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year from filing with PHRC, you have the right to file
your complaint in state court. PHRC will inform you of these rights and obligations at that time.
[Sign and date appropriate request below]

_X_ I want my charge filed with PHRC. I hereby incorporate this form and the verification below into
the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to
PHRC.

_X_ *I understand that false statements in this complaint are made subject to the penalties of 18*
*Pa.C.S. §4904, relating to unsworn falsification to authorities.*

X      *Michele Vandegrift 10-26-14*
       Signature and Date

_____ I do not want my charge dual filed with PHRC

       _____
       Signature and Date

City340

STATEMENT OF:   Det. Michele Vandegrift #755, PR# 251357
Appointment Date: 5-3-04
Assignment Date: 12-19-11
South Detective Division, 3B

DATE AND TIME:   11-11-14   2:45 PM

PLACE:   Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd.

IN THE PRESENCE OF:   Caren Gurmankin

CONCERNING:   EEO #14-0029

INTERVIEWED BY:   Sergeant Timothy Linneman #483
Lt. Danielle Vales #300

RECORDED BY:   Sergeant Timothy Linneman #483

Det. Vandegrift, I am Sergeant Timothy Linneman #483, Internal Affairs Division, and I will be taking your statement directly on this computer. You are being interviewed regarding a possible EEO complaint.

You are reminded, Detective, that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.

You are reminded, Detective, that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Det. Michele Vandegrift #755, PR# 251357, South Detective Division, 3B. I am currently detailed to Southwest Detective Division.

Q. Are you recording this interview?
A. No.

1

APPENDIX 101   City341

Q. Det. Vandegrift, did you send me an e-mail with an Amended Charge of Discrimination?
A. Yes.

Q. Why did you file this complaint with the Pennsylvania Human Relations Commission?
A. It is with the EEO commission and cross filed with the PHRC.

Q. Your state complaint indicated you had an incident with then Insp. Carl Holmes. Is that correct?
A. Yes.

Q. In your own words, please tell me what occurred?
A. In or around 2007, Carl Holmes, then my inspector told me to come into his office. When I went into his office I was standing against the wall. Insp. Holmes approached me and said "I want to know how wet you are." He then stuck his hand down my pants and my underwear and inserted his finger in my vagina. He then pulled his finger out of my pants and tasted his finger. I said I had to go and left his office.

Q. Did you say or do anything that would have led Insp. Holmes to do this?
A. No.

Q. When did this occur?
A. It happened in or around 2007.

Q. Where did this occur?
A. I was assigned to the 24th District. This happened inside his office at East Division.

Q. How did you end up in Insp. Holmes's office?
A. Insp. Holmes told me to come up but I do remember if he called or texted me.

Q. Did anyone else witness this incident?
A. No.

Q. Do you have any evidence from this incident?
A. No.

Q. Did you notify any police department personnel about this incident?
A. No.

Q. Did you tell any non-police personnel about this incident?
A. No.

Q. Why did you wait until you filed this EEO/PHRC complaint to make this incident public?
A. I was scared and afraid of any retaliation. I felt like I did not have anyone to turn to. He was the top boss in East Division.

2

APPENDIX 1014   *Det. Michele Vandarski #753*

City342

 

Q. Did you have any incidents (sexual contact) with Insp. Holmes prior to this incident?
A. No. Insp. Holmes had made inappropriate comments prior to this over the phone. Insp. Holmes approached me once when I was on the street and I knew him from the Academy. When I saw him on the street we exchanged cell phone numbers. He then contacted me first by phone and would talk dirty to me and tell me the things he would want to do to me. Eventually I stopped answering his calls.

Q. What was your reaction when Insp. Holmes started talking dirty to you on the phone?
A. I just listened.

Q. Did you ever tell Insp. Holmes this made you feel uncomfortable?
A. No.

Q. Did you tell anyone about Insp. Holmes speaking to you on the phone in this manner?
A. No.

Q. Did you have any incidents (sexual contact) with Insp. Holmes after this incident?
A. No. After this incident Insp. Holmes would still contact me by phone but I would not answer when he called me. The last phone call I got from him was a voice mail from him telling me I was transferred to the 9th District. Since then I have not had any contact with him.

Q. Did Insp. Holmes have any part on you getting transferred to the 9th District?
A. I assume he did but I do not know for certain that he did anything.

Q. How soon after the sexual contact were you transferred?
A. I was married in March 2007 and I was transferred in September 2007, but I can't give an exact date of when it happened. The sexual contact occurred within the first two weeks of March or prior to that.

Q. Before you got transferred, did Insp. Holmes ever make any comments to you about helping get you transferred?
A. I once asked him if I could be his aide before the sexual contact, but he told me no because the other girls in his office would not like it. There was never a conversation about helping me get transferred.

Q. Your state complaint indicated you had an incident with P/O Joseph Davis. Is that correct?
A. Yes.

Q. In your own words, please tell me what occurred?
A. In or around 2009, I was on patrol with P/O Davis. He told me that his girlfriend's vagina was too small and it hurt his penis when he had sex with her. He then pulled down the zipper of his pants and exposed himself to me.

3

APPENDIX 10451 - _michele Vandegrift_ City343 #755