**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHELE VANDEGRIFT | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  16-2999 |
| | : | |
| CITY OF PHILADELPHIA | : | |

## MEMORANDUM

KEARNEY, J.                                                            January 11, 2017

When a female detective complains about specific sexual assaults and harassment creating a hostile work environment involving certain officers, the police department must recognize, like any employer, its obligation to comprehensively and impartially address and evaluate appropriate remedies.   The female detective advised the department of specific credible claims of harassment and sexual assaults by identified officers in allegedly sexually charged police stations towards her and other women officers over many years including in 2014, resulting in an internal investigation of her complaints without remedy but instead changing the experienced female detective's conditions of employment.

The facts today are largely disputed as each side accuses the other of misconduct and the female detective also engaged in sexually charged banter claiming she needed to engender trust in a dangerous position.   In the accompanying Order, we deny the City's motion for summary judgment as the jury must evaluate what happened between the female detective and her male superiors as well as evaluate the propriety of the City's response to these specific claims.

### I.      Facts in the light most favorable to Ms. Vandegrift.[1]

In May 2004, twenty-one year old Michele Vandegrift entered the Philadelphia Police Academy.[2]   In December 2004, the City assigned this young female officer to the 24th District, where she worked for three years.[3]   In September 2007, the City transferred Ms. Vandegrift to the

9th District, where she worked until 2011.[4]   In 2011, after taking the detective's exam and scoring first among females and twentieth overall out of over 2,000 examinees,[5] Ms. Vandegrift became a detective and the City assigned her to the South Detectives Division.[6]  She remained in the South Detectives Division until 2014, when the City transferred her to the Southwest Division.  Ms. Vandegrift continues to work with the Philadelphia Police Department.

**A.  Alleged sexual harassment in the Philadelphia Police Department.**

Ms. Vandegrift specifically claims she worked in an environment allegedly riddled with sexual harassment, consisting of everything from sex-based comments to sexual assault by a high level employee—Chief Inspector Carl Holmes.  After complaining about the harassment, the City transferred her to another squad, told the squad she had filed an internal complaint, and charged her with misconduct.

**1.  Allegations of sexual assault against Chief Inspector Carl Holmes.**

Chief Inspector Carl Holmes joined the Police Department in August 1990.[7]  The City promoted him to Inspector in 2002, and he became a licensed attorney in 2003.  In 2008, the City demoted him to Captain for engaging in sexual activity in a police-issued vehicle.  After he challenged the demotion, the City reinstated him as Inspector.  In 2012, the City promoted him to his current position—Chief Inspector.  The only two ranks which are higher than Chief Inspector are Deputy Commissioner and Commissioner.

During Chief Inspector Holmes' employment, two female lower-ranking employees—including Ms. Vandegrift—accused him of sexual assault.  He did not receive any discipline as a result of the sexual assault allegations against him.  Possibly recognizing the harm created by his alleged conduct, Chief Inspector Holmes agrees—all things being equal—being a police officer

in the City is more difficult if you are a female.[8]   He also agrees female police officers hear comments about sex while working.[9]

Ms. Vandegrift alleges Chief Inspector Holmes sexually assaulted her in 2007.  In early 2007, leading up to the sexual assault, Chief Inspector Holmes called Ms. Vandegrift on the phone on at least three occasions and made sexual comments to her.  For example, Chief Inspector Holmes told Ms. Vandegrift he "would love to bend her over" and his "most favorite part of a woman's body" and the part of the body which turned him on most "was the part between her hips to her thighs."[10]

Around February or March 2007, Chief Inspector Holmes summoned Ms. Vandegrift to his office during her midnight shift.[11]   In the office, Ms. Vandegrift saw Chief Inspector Holmes out of uniform in an Eagles jersey and smoking at his desk.[12]   Chief Inspector Holmes approached Ms. Vandegrift and told her he "wanted to know how wet [she] was."[13]   He then unzipped her pants, stuck his hand down her pants and underwear, and inserted his finger into her vagina.[14]   He pulled his hand out, tasted his finger, and remarked "it tasted good."[15]   Ms. Vandegrift said something like "I'd better go" and left the office.[16]   She recalls smelling alcohol on his breath.[17]   Chief Inspector Holmes denies calling Ms. Vandegrift into his office, unzipping her pants, sticking his hands down her pants, and inserting his finger into her vagina.[18]

Officer Christa Hayburn alleged Chief Inspector Holmes sexually assaulted her in 2006. She states she attended Chief Inspector Holmes' going-away party at a bar.  During the event, Officer Hayburn received a phone call from a coworker, and she took the call outside.  While outside, Chief Inspector Holmes came outside, grabbed her hand, and guided her across the street to his car.  While they were behind car, he pulled her in to kiss her and told her he always

thought they "had something."[19]   Officer Hayburn told him they should go back inside, and he instructed her to let him know when she would be leaving.

When Officer Hayburn returned to the bar, she went directly to the bathroom, called her coworker back, told him what happened, and asked him for help.  After some time passed, Chief Inspector Holmes opened the door, looked in, and said, "Don't forget to tell me when you're leaving."[20]  As part of her escape plan, Officer Hayburn rushed out of the bar while on the phone with her coworker.

Just before Officer Hayburn would have started the ignition in her car, Chief Inspector Holmes ran out of the bar to Officer Hayburn and guided her out of the car and into his car. Officer Hayburn explained repeatedly, "[M]y husband is waiting for me.  I have to go.  This isn't right.  You are my boss."[21]  After Chief Inspector Holmes entered the car, he reached over and started kissing her "really hard," touched her breasts, and put his hands on the outside of her pants toward her genitals.[22]  He then reached into the back of Officer Hayburn's pants and digitally penetrated her vagina, after which he pulled out his penis and placed Officer Hayburn's hand on top of it.  Chief Inspector Holmes attempted to have intercourse and oral sex, but Officer Hayburn said, "No."[23]  Chief Inspector Holmes eventually ejaculated.

Officer Hayburn returned to her car, but she could not drive because she "was uncontrollably crying."[24]  She called her coworker, told him what happened, and he agreed to meet her at her location.  After a couple of hours of talking, Officer Hayburn drove home and told her husband what happened.

In February 2008, Officer Hayburn made an internal complaint regarding Chief Inspector Holmes' conduct.  As part of the investigation, the City impounded Inspector Holmes' city-issued vehicle, conducted a forensic examination, and found "seminal stains containing spermatozoa."[25]

Inspector Holmes denied engaging in sexual activity with Officer Hayburn.  He instead claims he had sexual relations with a female civilian in his city-issued vehicle on two occasions, which he claims caused the presence of his semen in the vehicle.  The investigators did not ask for the name of the civilian or for her description.   Chief Inspector Holmes did not provide investigators any contact information for the civilian.  Although Officer Hayburn had two witnesses who corroborated her account of the events, the investigation resulted in a finding of "not sustained."[26]

### 2. Sex-based comments and conduct by coworkers and supervisor-level employees.

While Ms. Vandegrift worked in the 24th District, "not a week went by" she did not allegedly experience "demeaning, inappropriate, barbaric" sex-based comments.[27]   Ms. Vandegrift testified this harassment followed her throughout her employment; she put up with sex-based comments and gawking stares on a "constant basis."[28]  For example, she repeatedly heard male officers discuss "what they would like to do to [her and other female employees] sexually" and heard them comment about women's breasts and backsides.[29]

Throughout Ms. Vandegrift's employment, her male colleagues and supervisory-level employees, including Lieutenant Anthony LaSalle, Detective James Priadka, and Inspector Anthony Washington, stared at her in an intimidating and uncomfortable manner.[30]  When she complained about how stares made her uncomfortable, Lieutenant LaSalle told her she should take the stares as a compliment.[31]

Early on in her employment, Ms. Vandegrift became the subject of rumors she engaged in sexual relationships with coworkers, and these rumors resurfaced a number of times throughout her employment.  For instance, in 2005, Ms. Vandegrift heard rumors within her squad she engaged in sexual relationships with "multiple police officers" in her squad.[32]

Ms. Vandegrift's coworkers and supervisors made inappropriate sexual comments toward her throughout her employment.  In 2005 or 2006, Ms. Vandegrift attended a softball game for the 24th District, and two male colleagues—Officers Fran Kober and Rob Phillippe—commented on how good she looked and told her they would "hit that."[33]   At some point between 2005 and 2007, one of Ms. Vandegrift's male colleagues—Officer McLoud—told her she sounded sexy over the radio and he got a "woody" when he heard her.[34]

In 2007, Ms. Vandegrift came to work with a sunburn on her face.[35]   Sergeant Alfred Corson asked Ms. Vandegrift if she got the sunburn while engaging in "roadhead" with her then-fiancé.[36]  Also in 2007, Officer Terrance O'Hanlon commented about a new female police officer who had just graduated from the police academy, "Oh my God, did you see her.  She's just my type.  I'd fuck the shit out of her."[37]   Around the same time period, Ms. Vandegrift's male supervisor—Officer Alfred Corson—told her she would have to be the one to make the first move.[38]  Ms. Vandegrift understood this to mean he wanted her to initiate a sexual relationship with him, as he could not do so as her supervisor.[39]

In 2009, during a patrol, Officer Joe Davis told Ms. Vandegrift his girlfriend's vagina was too small and hurt his penis during sex, after which Officer Davis unzipped his pants and pulled out his penis.[40]  The same year, Ms. Vandegrift heard Chief Inspector Holmes had forced a female to give him fellatio.[41]  Also in 2009, Lieutenant Ed Thompson told Ms. Vandegrift he knew of at least one male employee who sent a picture of his penis to a female officer.[42]  Around the same time period, Corporal James Gillespie told Ms. Vandegrift the officers in the squad she worked in at the time thought she had been "fucking" her male supervisor, Sergeant Thomas Tamulis.[43]

In 2009 or 2010, Ms. Vandegrift heard her supervisor—Sergeant John Wood—had said a female officer—Officer Gale Bryant—had been "banging" her supervisor, Paul DeCarlo.[44]  In 2010, Officer Davis told Ms. Vandegrift there were rumors she "was 'fucking' him."[45]  Around the same time period, while Ms. Vandegrift walked to the women's locker room, Officer Luis Santiago left the men's locker room with his pants unzipped.[46]  Before zipping up his pants, Officer Santiago made sure to stop and see Ms. Vandegrift looking at him.[47]  When Ms. Vandegrift told him to never do that again, Officer Santiago rolled his eyes and said, "whatever."[48]

In 2010 or 2011, a male officer slapped Ms. Vandegrift on her backside while walking by.[49]  Around the same time period, Officer Matt Harris told Ms. Vandegrift Officer Mike Givens sent Officer Gayle Hawthorne a picture of his penis.[50]  Also around the same time, Sergeant John Wood—Ms. Vandegrift's supervisor—commented on a female officer returning from maternity leave, stating "she would just have to make up her mind, did she want to be a mom or a cop, she can't do both."[51]

In 2011, Ms. Vandegrift's supervisor—Sergeant John Wood—told her about a rumor of a female officer who had an affair with a higher level male sergeant in their squad.[52]  During the conversation, Sergeant Wood said, "No man would ever turn down a blow job."[53]  Ms. Vandegrift understood this to mean Sergeant Wood wanted her to offer him a blow job, and he would accept it.[54]  Also in 2011, Lieutenant Ed Thompson told Ms. Vandegrift Sergeant DeAngelo (male) said he was "fucking the shit out of" Officer Gayle Bryant.[55]

In 2011, Ms. Vandegrift and Officer George Gaspar were driving together and stopped to talk to two male colleagues—Officers Vernon Ray and James Owens.[56]  After they drove away, Officer Gaspar showed Ms. Vandegrift a text message one of the officers sent him, stating, "are

you fucking that".[57]  Also in 2011, Officer Rick Soto put his hand over Ms. Vandegrift's hand, rubbed it, and said, "you like that, baby?"[58]  Around the same time period, male officers including Officer Chris Simone, Officer Pat Gallagher, and Officer Givens gawked at women walking by, commented women in Center City were much better looking than women in the rest of the city, and said in reference to certain women, "I'd fuck her."[59]

In 2012, after Ms. Vandegrift told Lieutenant James DeAngelo she wanted to have children with her husband, he responded, "so you're fucking a lot."[60]  Also in 2012, Detective Justin Carlton referred to a female detective as a "bitch" in front of other employees, including Ms. Vandegrift.[61]

In 2012 or 2013, after a female complainant left the police station, male detectives including Mike McKenna commented, "Did you see that girl's ass" and "you can bounce a quarter off of her ass."[62]  Around the same time period, Detectives Neil Aitken and George Bailey referred to Detective Michele Hunker—an aide to the Captain—as "a blow job."[63]

In 2013, shortly after Ms. Vandegrift returned from maternity leave, her male supervisor, Sergeant Maurice Hampton said, "you can't be a good mom and a good cop."[64]  Since 2013, Ms. Vandegrift saw Detective John Ruth kept a large coffee mug on his desk which said, "Get Off My Dick."[65]

In 2014, Ms. Vandegrift heard male detectives, including John Ruth, comment about a female district attorney, "that's a lot of ass."[66]  Also in 2014, upon hearing rumors a female lieutenant would join the division, Detective John Ruth said their male supervisor—Sergeant Maurice Hampton—would not be happy.[67]  When Ms. Vandegrift asked him why, Detective Ruth said "because she is a woman, and [Sergeant Hampton] was not going to want to report to a woman."[68]

On June 25, 2014, when Ms. Vandegrift returned from vacation, Detective Ruth asked her where she went.[69]   After Ms. Vandegrift said she went with her family to Ocean City, Detective Ruth said he thought she went to Hedonism.[70]   Ms. Vandegrift understood Detective Ruth's reference to Hedonism as referencing a vacation spot in Jamaica known to be a "sexually wild" destination for nudists and swingers.[71]   When Ms. Vandegrift told Detective Ruth she would never go there for vacation as she is married with a baby, he responded "that [is] an 'even better reason to go.'"[72]

In July 2014, Detective Ruth looked at Ms. Vandegrift's chest and said, "What, are you trying to show off your cleavage today?"[73]   He then laughed and punched Ms. Vandegrift in the arm.[74]   Detective James Priadka also looked at Ms. Vandegrift's chest and laughed.[75]

### 3.   The Jerry Jones text message.

In August 2014, Detective Ruth sent Ms. Vandegrift and her male colleagues a group text message depicting someone who looked like Ms. Vandegrift with her head pressed against the crotch of Jerry Jones, asking "Does anyone know this girl with [Captain] Larry Nodiff (Whiskey Harry/white hook)?"[76]   Detective Neal Aitken wrote in response, "Yeah, yeah.   She looks familiar.   Yeah yeah I think I've got it."[77]   Ms. Vandegrift is known to say, "yeah, yeah" frequently.[78]   Ms. Vandegrift understood Detective Ruth's text as insinuating Ms. Vandegrift had a sexual relationship with her previous captain, Larry Nodiff.[79]   Ms. Vandegrift is aware a stripper recently accused Jerry Jones of sexually assaulting her.[80]   The woman who brought the lawsuit alleged she took pictures of Jerry Jones with other women, including the picture Detective Ruth sent.[81]

Although the text offended Ms. Vandegrift, she responded to the text message in a joking manner because she did not want to risk losing her colleagues' trust by complaining about the

text.[82]  She later deleted her responsive text messages because she wanted to show her mother the Jerry Jones text message but she did not want her mother to see her text responses.[83]

**B. Ms. Vandegrift complains about gender discrimination and sexual harassment.**

On August 25, 2014, Ms. Vandegrift made an internal Equal Employment Opportunity ("EEO") complaint of gender discrimination.[84]  On the same day, Ms. Vandegrift called Captain Martin Derbyshire—captain of the South Detectives Division—and informed him of her complaint.

Shortly before Ms. Vandegrift made the internal EEO complaint, she had complained to her supervisor—Lieutenant LaSalle—about the manner in which her male colleague assigned jobs requiring more overtime to male detectives.[85]  Ms. Vandegrift had also complained to Lieutenant LaSalle her male colleagues started rumors she and the Lieutenant were "fucking" each other.[86]  In response, Lieutenant LaSalle said he could not say anything to Ms. Vandegrift's male colleagues because, if he did, it would look like he "was sticking up" for her.[87]  When Ms. Vandegrift showed Lieutenant LaSalle the Jerry Jones text message, he responded the squad was "fucking stupid," but did nothing to address the inappropriate text message.[88]

On August 27, 2014, Ms. Vandegrift filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").[89]  Ms. Vandegrift's EEOC Charge and internal EEO complaint included allegations of sexually discriminatory conduct, including but not limited to: 1) the Jerry Jones text; 2) the fact male employees received more complex assignments, resulting in more overtime; and 3) an incident in which a male sergeant asked if anyone had the (male) lieutenant's phone number, and when Ms. Vandegrift said yes and handed him her phone, the Sgt. said, "hold up he's not going to answer the phone and say hey baby?"[90]

On October 27, 2014, Ms. Vandegrift filed an Amended Charge.[91]  The Amended Charge included more allegations of sexual harassment, including the incident when Chief Inspector Holmes stuck his finger into Ms. Vandegrift's vagina and the incident when Officer Davis exposed his penis to her while on a patrol.[92]  The Amended Charge also included a claim the City retaliated against her by filing the first Charge.[93]  Ms. Vandegrift subsequently filed a second, third, and fourth Amended Charge.

### C.  The City's response to Ms. Vandegrift's complaints.

Shortly after Ms. Vandegrift made her internal EEO complaint, Captain Derbyshire spoke with his superior and told him he would transfer Ms. Vandegrift from 3 Squad to 2 Squad.[94]  The superior, an Inspector, responded, "that would be a good move."[95]  Captain Derbyshire then told Lieutenant Morton—who is responsible for 2 Squad—he would transfer Ms. Vandegrift to 2 Squad because she filed the internal EEO complaint.[96]  Ms. Vandegrift did not want to leave 3 Squad, where she worked the night shift, because she needed the night shift schedule.[97]  Ms. Vandegrift's mother normally watched her son, but at the time her mother could not because she was hospitalized.[98]

After Ms. Vandegrift's transfer to 2 Squad, employees in the South Detectives Division learned of Ms. Vandegrift's internal EEO complaint.[99]  Detective Robert Kerwin told Ms. Vandegrift her "squad" told him "not to trust her because she was fucking the last out lieutenant and that she backstabbed him by making a complaint against him."[100]  Detective Kerwin also told Ms. Vandegrift his squad had a meeting before Ms. Vandegrift's transfer in which Lieutenant Morton, Sergeant Steven Vanore, and Sergeant Curtis Miller told everyone she made an EEO complaint and to "watch what they say around her."[101]

Ms. Vandegrift testified members of 2 Squad would not to talk to her: "I used to work at 2 Squad.  We got along quite well.  However, after Detective Kerwin told me what had happened, suddenly we were strangers.  They turned their back on me.  They wouldn't to [sic] speak to me.  They didn't even want to act like I was in the room."[102]

Lieutenant Timothy Linneman worked in the EEO unit of the Internal Affairs Bureau of the Philadelphia Police Department from December 2012 to December 2014.  His responsibilities included handling investigations involving EEO-related complaints.[103] Lieutenant Linneman testified it could possibly be a violation of the City's EEO policy for employees to say an individual who made an EEO complaint could not be trusted.[104]  Lieutenant Linneman also testified doing so would be a form of retaliation.[105]  Captain Derbyshire also testified he would be concerned if a detective said another detective could not be trusted; he would have addressed it if he knew about it.[106]

On September 5, 2014, Lieutenant Morton informed Captain Derbyshire Ms. Vandegrift "was upset and that she did not – it wasn't working out.  That the 2 Squad situation was not working out."[107]  Captain Derbyshire spoke with Inspector Anthony Washington about the issue, who informed Captain Derbyshire he would speak with his supervisor—Chief Inspector Myron Patterson.[108]  Inspector Washington told Captain Derbyshire Ms. Vandegrift would be reassigned to the Southwest Division.[109]

The Southwest Division is an extremely busy and hectic place to work.[110]  There is a perception within the Philadelphia Police Department assignment to the Southwest Division is a punishment.[111]  The Southwest Division is also a longer commute for Ms. Vandegrift than the South Division.[112]  Captain Derbyshire told Ms. Vandegrift the City reassigned her to the Southwest Division for her protection.[113]  When she asked what he meant, Captain Derbyshire

said they could not move all the male detectives at once, so they were going to move her for her protection.[114]  Captain Derbyshire never spoke with Ms. Vandegrift about whether she wanted to move out of the South Division before he talked with Inspector Washington.[115]  Captain Derbyshire never considered moving the male detectives who engaged in the conduct Ms. Vandegrift had complained about.[116]

**D.  The City's investigation into Ms. Vandegrift's allegations.**

Between August 2014 and June 2015, Ms. Vandegrift underwent five interrogations from investigators in the Internal Affairs Division regarding her complaints.  On August 27, 2014, the City assigned Lieutenant Linneman to investigate Ms. Vandegrift's complaints. [117]  As a result of the investigation, the City found only one employee—Detective Ruth—violated the City's EEO policy.  The City has yet to discipline Detective Ruth.[118]

Ms. Vandegrift retained Michael J. Torchia, Esq., as an expert in workplace investigations.  He opines the City's sexual harassment complaint procedures and investigative practices failed to satisfy a number of workplace investigation standards:

> It is my opinion that the City failed to conduct reasonable investigations, as using internal investigators does not meet accepted standards for workplace investigations;
>
> It is my opinion that the City's method of investigation was not reasonable as it failed to meet accepted standards for workplace investigations for a variety of reasons, including but not limited to:
>
> a.  The investigators improperly applied a criminal law standard to some of Det. Vandegrift's complaints;
> b.  The investigators failed to investigate all claims, including no investigation of Det. Vandegrift's retaliation complaints;
> c.  The investigators failed to interview or investigate, or attempt to interview or investigate anyone not currently employed by the Philadelphia Police Department;
> d.  The investigators' questioning methods were unreasonably brief and shallow;

e. The investigations should have been conducted by a single investigator;

f. The investigators failed to review or consider background information about the alleged harassers;

g. The investigators failed to judge the credibility of the complainant, witnesses and alleged harassers.[119]

Lieutenant Raymond Saggese has been an investigator in the internal affairs division for sixteen years.  During Lieutenant Saggese's interview of Ms. Vandegrift during the investigation, Lieutenant Saggese told Ms. Vandegrift certain employees have "carte blanche" to act the way they do, and he had "run into a brick wall" regarding other investigations.[120]  He also told Ms. Vandegrift other sexual allegations against "higher-ups" are swept under the rug.[121]

**E.  The City charges Ms. Vandegrift with misconduct.**

On July 29, 2014, Ms. Vandegrift sent a Facebook message to four of her male colleagues in her squad which included a picture of a baby whose facial expression reminded her of Detective Ruth and included quotes from Detective Ruth:

> John Ruth at 6 months.  He's saying- 'yo Jim this job won't make me money' 'My payroll number is…' 'Get off my Dick' 'a good detective is knowing when to work hard on a job and when to put the crap aside' 'this is silly'  'you alright buddy?' Yep, 30 years later and not much has changed lol.[122]

Detective Ruth responded, "Lmao good one.  But remember your [sic] next.  Yeah yeah."[123]  Ms. Vandegrift testified she sent the message because she wanted to fit in with the men.[124]

As part of the investigation, Ms. Vandegrift had an interview on August 29, 2014 with Lieutenant Linneman.[125]  Ms. Vandegrift told Lieutenant Linneman about the Facebook message during the interview.[126]  Lieutenant Linneman did not ask Ms. Vandegrift any questions about the message.

14

Ms. Vandegrift also provided Lieutenant Linnenman the Jerry Jones text message.[127]  Ms. Vandergrift told Lieutenant Linneman she did not have her responses to the Jerry Jones text message.[128]  She candidly disclosed to him her comments may have been inappropriate.[129]  Lieutenant Linneman told her, "Don't worry about it, it doesn't matter, you're the victim."[130]

The City's investigation into Ms. Vandegrift's allegations resulted in a charge she violated City policy by sending the Facebook message.[131]  The City also charged Ms. Vandegrift with lying or attempting to deceive regarding a material fact during the course of the investigation.[132]  These were the first disciplinary charges issued against Ms. Vandegrift during her entire employment with the City.[133]

If an allegation of misconduct is made against a police officer, City policy requires the police officer be questioned about the allegation.[134]  No one questioned Ms. Vandegrift regarding any alleged misconduct on her part.[135]

Chief Inspector Christopher Flacco testified the City disciplined Ms. Vandegrift for the Facebook message because she complained about similar conduct:

> Q.   So do you agree with me, then, that the reason why Vandegrift is being written up for the Facebook message is because she made the complaint about similar conduct herself?
> A.   You can make that assumption, yeah, that's part of it.[136]

## II.   Analysis

Ms. Vandegrift sued her employer, the City, for gender discrimination, hostile work environment, and retaliation claims under Title VII of the Civil Rights Act of 1964,[137] the Pennsylvania Human Relations Act ("PHRA"),[138] and the Philadelphia Fair Practices Ordinance.[139]  Ms. Vandegrift also sued the City under 42 U.S.C. § 1983 for having an unconstitutional custom of treating female employees in the Police Department less favorably

than male employees. The City moves for summary judgment[140] arguing Ms. Vandegrift failed to exhaust her employment discrimination claims under the Philadelphia Fair Practices Ordinance, her claims are untimely, and her claims fail as a matter of law.[141]   We disagree and deny the City's motion for summary judgment.

### A.   Ms. Vandegrift exhausted administrative remedies under the Philadelphia   Fair Practices Ordinance.

The City argues Ms. Vandegrift failed to exhaust administrative remedies under the Philadelphia Fair Practices Ordinance because she did not file a complaint with the Philadelphia Commission on Human Relations.  Ms. Vandegrift argues she exhausted administrative remedies under the Philadelphia Ordinance because she administratively exhausted her employment discrimination claims with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission.

The PHRA authorized local governments to create human relations commissions with "powers and duties similar to those . . . exercised by the [PHRC]."[142] Based on this authority, Philadelphia County passed the Philadelphia Fair Practices Ordinance ("Philadelphia Ordinance") and established the Philadelphia Commission on Human Relations ("Philadelphia Commission") to "administer and enforce all statutes and ordinances prohibiting discrimination against persons because of race, color, religion or national origin" and "to receive . . . complaints of . . . practices of discrimination against any person because of race, color, religion or national origin."[143]

The Philadelphia Ordinance prohibits, among other things, employment discrimination based on sex and retaliation for exercising one's rights under the Philadelphia Ordinance.[144] Under the Ordinance, "[a]ny person claiming to be aggrieved by an unlawful employment . . . practice may make, sign, and file with the [Philadelphia Commission] a verified complaint."[145]

A complaint will not be considered by the Philadelphia Commission unless it is filed within 300 days of the unlawful practice.[146]   The Philadelphia Commission does not accept any complaint "from any person who has filed a complaint with the Pennsylvania Human Relations Commission with respect to the same grievance."[147]

The Philadelphia Ordinance also contains a private right of action:

> If a complainant invokes the procedures set forth in this Chapter, that person's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant may bring an action in the Court of Common Pleas of Philadelphia County based on the right to freedom from discrimination granted by this Chapter.[148]

The Philadelphia Ordinance also provides, "Nothing in this Chapter limits the right of an injured person to recover damages under any other applicable law or legal theory."[149]

The Pennsylvania Supreme Court has not determined whether claims under the Philadelphia Ordinance must be administratively exhausted.   The Pennsylvania Commonwealth Court and courts in our Circuit have held claims under the Ordinance must satisfy the exhaustion requirement.[150]   Courts in our Circuit hold the exhaustion requirement is satisfied by filing a complaint with another administrative body as long as the claims under the Philadelphia Ordinance are predicated upon the same facts as the claims before the administrative body.[151]

For example, in *Ives v. NHS Human Services*, Judge Joyner held Ives' filing with the EEOC satisfied the Ordinance's administrative exhaustion requirement.[152]   Ives did not mention her Philadelphia Ordinance claims in her EEOC charge, but she based her Philadelphia Ordinance claims on the same facts with the same core grievance.[153]   Similarly, in *Ahern v. Eresearch Technology*, Judge Jones found Ahern satisfied the Philadelphia Ordinance's

administrative exhaustion requirement by filing an EEOC charge dealing with the same issues as her claims under the Philadelphia Ordinance.[154]

Although we find these decisions persuasive, they did not address the text of the Philadelphia Ordinance.  "In interpreting local ordinances, we apply rules of statutory construction."[155]  Our "primary goal" is ascertaining the intent of the Philadelphia City Council.[156] "Where a statute is unambiguous, its plain text will not be disregarded in furtherance of its spirit."[157]  A statute is ambiguous where there are two or more reasonable interpretations.[158] To ascertain legislative intent from the ambiguity, we must consider the factors listed in 1 Pa. C.S. § 1921(c).[159]  These factors include, among other things, "[t]he mischief to be remedied," "the object to be attained," and "the consequences of a particular interpretation."[160]

We find the Philadelphia Ordinance is partially ambiguous.  The plain text of the Philadelphia Ordinance requires the complainant file with the Commission and requires, as a condition of suing in court, the receipt of a notice of the right to sue by the Commission.[161]  The Philadelphia Ordinance prohibits the complainant from filing a complaint with both the Philadelphia Commission and the Pennsylvania Human Relations Commission, even though filing a complaint with the Pennsylvania Human Relations Commission is a prerequisite to obtaining relief under the PHRA.  These provisions of the Philadelphia Ordinance would thus preclude a complainant from seeking relief under the PHRA.  These provisions conflict with the provision of the Philadelphia Ordinance providing, "Nothing in this Chapter limits the right of an injured person to recover damages under any other applicable law or legal theory."[162]  These competing provisions create an ambiguity.

Upon reviewing 1 Pa. C.S. § 1921(c), we conclude the Philadelphia City Council intended claims under the Philadelphia Ordinance satisfy an administrative exhaustion

requirement, which can be satisfied by filing a complaint with another administrative body. In enacting the Philadelphia Ordinance, the City Council recognized the harmful effects of employment discrimination, which "tends to create breaches of the peace and impose added burdens upon the public for relief and welfare."[163]  The Council enacted the Philadelphia Ordinance "to assure that all persons regardless of . . . sex . . . enjoy the full benefits of citizenship and are afforded equal opportunities for employment."[164]  This purpose is more fully achieved if aggrieved individuals may employ all available statutory remedies.

Forcing an individual to choose between either enforcing rights under the PHRA or enforcing rights under the Philadelphia Ordinance runs contrary to the stated purpose of the Ordinance.  City Council likely prohibited the Philadelphia Commission from accepting complaints filed with the Pennsylvania Human Relations Commission to preserve administrative resources.  We conclude City Council intended to permit aggrieved individuals to pursue relief in a court of competent jurisdiction so long as the issues raised in the lawsuit are administratively exhausted.

Ms. Vandegrift's dual-filing of her charges of discrimination with the EEOC and the Pennsylvania Human Relations Commission satisfied the Philadelphia Ordinance exhaustion requirement because her claims under the Philadelphia Ordinance are predicated upon the same facts as the claims in her EEOC charges.

**B.    Ms. Vandegrift's claims are not barred by a statute of limitations.**

The City argues acts forming the basis of her hostile work environment and § 1983 claims occurring before 2013, including the 2007 sexual assault, are time barred because they are isolated or sporadic and not sufficiently linked to constitute one unlawful employment practice.

The City argues the 2007 sexual assault is an individually actionable discrete act which cannot be considered for the purposes of Ms. Vandegrift's hostile work environment claim.

Ms. Vandegrift's claims under Title VII, the PHRA, and § 1983 must satisfy timing requirements.  Under the PHRA, Ms. Vandegrift must file an administrative complaint within 180 days of the alleged act of discrimination.[165]  Under Title VII, Ms. Vandegrift must file an administrative complaint within 300 days of the unlawful employment practice.[166]  Under § 1983, Ms. Vandegrift's claims must arise within the two years preceding the filing of the complaint.[167]  Ms. Vandegrift filed her First EEOC Charge on August 27, 2014.  She filed an Amended EEOC Charge on October 27, 2014, in which she included allegations of the 2007 sexual assault and other allegations of harassment.  One hundred eighty days before October 27, 2014 is April 30, 2014.

"The continuing violations doctrine is an 'equitable exception to the timely filing requirement.'"[168]  For the purposes of Ms. Vandegrift's hostile work environment claim and claim for the City's supervisory liability, we distinguish between discrete acts and nondiscrete acts.  "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[169]  A discrete act "constitutes a separate actionable unlawful employment practice"[170] and "must be raised within the applicable limitations period or they will not support a lawsuit."[171]  A discrete act is an individually actionable unlawful employment practice which includes "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation."[172]

By contrast, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[173]  Nondiscrete discriminatory acts which are not individually actionable may be aggregated to form a hostile work environment

claim under the continuing violation doctrine.[174]   "[S]uch acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."[175] To bring in nondiscrete acts occurring before the limitations period under the continuing violation doctrine, Ms. Vandegrift must show: (1) "all acts which constitute the claim are part of the same unlawful employment practice"; and (2) "at least one act falls within the applicable limitations period."[176]   In determining whether the harassment is part of a "persistent, ongoing pattern" constituting one unlawful employment practice, we may consider the subject matter and frequency of the underlying acts.[177]   Subject matter is defined as "whether the violations constitute the same type of discrimination."[178]

Our Court of Appeals has not instructed as to whether a sexual assault is a discrete act. District courts are split on this issue, including within our Circuit.[179]   The courts finding sexual assault constitutes a discrete act rely on the prevailing definition of a discrete act as an act which is individually actionable.[180]

At least one district court outside our Circuit held sexual assault did not constitute a discrete act for the purposes of the defendant-employer's motion to dismiss.[181]   The court reasoned the employee did not allege the sexual assault "was distinct, isolated act of discrimination" alleged to be "different in nature or distant in time from the remainder of her claims."[182]

One district court in our Circuit held a rape did not constitute a discrete act.[183]   The plaintiff's supervisor raped her and subsequently harassed her almost every day by, among other things, sexually assaulting her and sending her pornographic text messages.[184]   Judge Cercone held "[w]hile the rape may have been sufficient, alone, to meet the requirements of a hostile work environment claim, [the supervisor's] conduct . . . clearly suggests 'a persistent, ongoing

pattern' characteristic of a continuing violation."[185]  "The subsequent unwelcome sexual assaults and harassment occurring within the 300 day period make the rape and all other conduct occurring prior to [the 300 day period] part of the whole for purposes of the hostile work environment claim."[186]

The Supreme Court has made clear sexual assault or rape can form the basis of a hostile work environment claim.  In *Meritor Savings Bank v. Vinson*, the Supreme Court held as a general matter a plaintiff may pursue a hostile work environment theory under Title VII.[187]  In *Meritor*, the plaintiff's supervisor repeatedly harassed her and even raped her on several occasions over a period of four years.[188]  The Court explained sexual harassment is actionable if it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"[189]  Under this standard, the plaintiff's allegations, "which include not only pervasive harassment but also criminal conduct of the most serious nature," were "plainly sufficient" to state a claim for hostile work environment.[190]

We conclude Ms. Vandegrift's 2007 sexual assault should be considered under the continuing violation doctrine as a severe form of harassment—even if it is individually actionable.  After *Meritor*, rape can form the basis of a hostile work environment claim.  Consistent with *Meritor*, the Supreme Court in *Morgan* identified several types of discrete acts— including "termination, failure to promote, denial of transfer, or refusal to hire"[191]—which cannot be aggregated under the continuing violation doctrine.

The Court did not identify rape or sexual assault as a discrete act.  Nor would it make sense to do so.  Sexual assault is the most severe form of harassment, and severe harassment is actionable under a hostile work environment claim.[192]  It would be anomalous to deem some severe forms of harassment—such as rape or sexual assault—so severe they cannot be

aggregated under the continuing violation doctrine along with less severe acts of harassment. Rather than focusing our inquiry on whether an individual act of harassment is so severe as to constitute a discrete act, we instead focus on whether the act of harassment constitutes part of a pattern of harassment constituting "one 'unlawful employment practice.'"[193]   Under this inquiry, it does not matter whether the 2007 sexual assault is actionable on its own.  What matters is whether the sexual assault is "part of the same unlawful employment practice."[194]

Ms. Vandegrift provides sufficient evidence of a persistent, ongoing pattern of harassment which includes the 2007 sexual assault.  While Ms. Vandegrift worked in the 24th District, "not a week went by" she did not experience "demeaning, inappropriate, barbaric" sex-based comments.[195]  Ms. Vandegrift testified this harassment followed her throughout her employment; she put up with sex-based comments and gawking stares on a "constant basis."[196]  For example, she repeatedly heard male officers discuss "what they would like to do to [her and other female employees] sexually" and heard them comment about women's breasts and backsides.[197]

The harassment also manifested in the form of rumors about Ms. Vandegrift having sexual relations with coworkers.  In 2005, Ms. Vandegrift heard rumors within her squad she engaged in sexual relationships with "multiple police officers" in her squad.[198]  Rumors about Ms. Vandegrift and other female officers having sexual relationships with coworkers and supervisors resurfaced regularly during her employment.

In 2007, before his alleged sexual assault, Chief Inspector Holmes called Ms. Vandegrift on at least three occasions and said sexual things to her, including he "would love to bend her over" and his "most favorite part of a woman's body" and the part that turned him on most "was the part between her hips to her thighs."[199]  In 2009, during a patrol, Officer Davis told Ms.

Vandegrift his girlfriend's vagina was too small and hurt his penis during sex, after which Officer Davis unzipped his pants and pulled out his erect penis.[200]

In 2010, Officer Davis told Ms. Vandegrift there were rumors she "was 'fucking' him."[201]  In 2010 or 2011, a male officer slapped Ms. Vandegrift on her backside while walking by.[202]  In 2012, after Ms. Vandegrift told Lieutenant James DeAngelo she wanted to have children with her husband, he responded, "so you're fucking a lot."[203]  In 2013, shortly after Ms. Vandegrift returned from maternity leave, her male supervisor, Sergeant Maurice Hampton said, "you can't be a good mom and a good cop."[204] In August 2014, Detective Ruth sent Ms. Vandegrift and her male colleagues a text message depicting someone who looked like Ms. Vandegrift with her head pressed against the crotch of Jerry Jones, asking "Does anyone know this girl with [Captain] Larry Nodiff (Whiskey Harry/white hook)?"[205]  These discriminatory acts, along with the other discriminatory acts alleged, share the same subject matter—sex—and occur with sufficient frequency to be considered collectively under the continuing violation doctrine.   At least one act—the August 2014 text message—occurred within the limitations period.   Ms. Vandegrift provides sufficient evidence of a pattern of ongoing sexual harassment occurring throughout her employment and into the limitations period.

### C.   Ms. Vandegrift may proceed on her hostile work environment claims under Title VII, the PHRA, and the Philadelphia Ordinance.[206]

The City argues Ms. Vandegrift fails to satisfy the elements of a hostile work environment: (1) she suffered intentional discrimination because of her sex; (2) she suffered severe or pervasive discrimination; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in similar circumstances; and (5) the existence of *respondeat* superior liability.[207]   For summary judgment purposes, the City

contests only the severity or pervasiveness of the discrimination and the City's supervisory liability.

### 1. Ms. Vandegrift adduced evidence of severe or pervasive harassment.

To determine whether an environment is severe or pervasive, we must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[208]   "[T]he 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"[209]   This analysis "must concentrate not on individual incidents, but on the overall scenario."[210]   "[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment."[211]

By way of example, in *Brooks v. City of Philadelphia*, the plaintiff—a police officer for the Philadelphia Police Department—provided sufficient evidence to demonstrate severe or pervasive sexual harassment.[212]   The plaintiff's coworkers watched pornographic films while at work and laughed at plaintiff while doing so.[213]   Male coworkers changed clothes in front of her. "[T]he use of inappropriate language was rampant," and male coworkers called her "bitch" and "crazy bitch."[214]   Our learned colleague Judge Surrick concluded, "Any one of these circumstances alone, and certainly all taken together, are sufficient to establish that Plaintiff suffered a hostile work environment on account of her gender."[215]

Based on both the frequency and severity of the alleged conduct, a reasonable jury could conclude Ms. Vandegrift experienced severe or pervasive harassment.   Ms. Vandegrift testified she experienced sex-based comments or conduct at least weekly throughout her employment, and she provided many specific examples.   Ms. Vandegrift also claims Chief Inspector Holmes

sexually assaulted her and a coworker exposed his penis to her while they were in a patrol car. Considering the totality of the circumstances, a reasonable jury could conclude Ms. Vandegrift personally endured severe or pervasive harassment.

### 2. Ms. Vandegrift adduced sufficient evidence of the City's possible respondeat superior liability.

The City argues it took reasonable remedial measures in response to Ms. Vandegrift's complaint of harassment.  "If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action."[216]   In cases where there is no tangible employment action, an employer may defeat vicarious liability by showing "'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'"[217]

An employer is liable for a coworker's harassment "only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."[218]   In other words, "an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment."[219]   For example, in *Kidd v. Pennsylvania*, Judge Van Antwerpen found a genuine dispute of material fact as to whether the defendants' remedial efforts were appropriate where the defendants' remedial efforts consisted of "speaking with" or "counseling" the alleged harassers.[220]

A reasonable jury could conclude the City failed to respond appropriately to Ms. Vandegrift's allegations.   After Ms. Vandegrift filed her internal EEO complaint, the City

conducted an investigation resulting in only one alleged harasser—Detective Ruth—charged with violating City policy.  The City has not yet disciplined Detective Ruth for his charged misconduct.  Captain Derbyshire admits he could have required harassment training, but he did not do so.  Instead, the City transferred Ms. Vandegrift to a different squad and then later to a different division.

Ms. Vandegrift's expert on workplace investigations recognized many deficiencies in the investigation including: a) The investigators failed to investigate all claims, including Ms. Vandegrift's retaliation complaints; b) The investigators failed to interview or investigate, or attempt to interview or investigate anyone not currently employed by the Philadelphia Police Department; c) The investigators' questioning methods were unreasonably brief and shallow; d) The investigations should have been conducted by a single investigator; e) The investigators failed to review or consider background information about the alleged harassers; and f) The investigators failed to judge the credibility of Ms. Vandegrift, the witnesses, and the alleged harassers.[221]   We find a genuine dispute of material fact as to whether the City properly responded to Ms. Vandegrift's harassment allegations and whether it exercised reasonable care to correct the alleged harassment.

**D.    Ms. Vandegrift may proceed on her retaliation claims.**

To state a *prima facie* case of retaliation under Title VII, Ms. Vandegrift must establish: (1) she engaged in protected activity; (2) the employer engaged in conduct constituting an adverse action either contemporaneous with or after the protected activity; and (3) a causal connection between the protected activity and the adverse action.[222]   If Ms. Vandegrift establishes a *prima facie* case, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action."[223] The burden

then shifts back to Ms. Vandegrift to prove "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[224]

The City's sole argument is Ms. Vandegrift cannot demonstrate she suffered a materially adverse action.   Under Title VII's anti-retaliation provision, Ms. Vandegrift must show a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[225]   In determining whether a reasonable worker would be deterred, "[c]ontext matters."[226]   "[T]he significance of any given act of retaliation will often depend upon the particular circumstances" because "an 'act that would be immaterial in some situations is material in others.'"[227]   For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."[228]

Ms. Vandegrift claims she suffered what we discern to be four possible materially adverse actions: 1) supervisory-level employees labeled her as untrustworthy by telling her coworkers she filed an EEO complaint; 2) her male colleagues spread rumors about her having a sexual relationship with a lieutenant; 3) the City reassigned Ms. Vandegrift to another division where work is extremely hectic and busy; and 4) the City charged her with misconduct following the investigation.

### 1.   Supervisory-level employees labeled Ms. Vandegrift as untrustworthy by telling her coworkers she filed an EEO complaint.

A reasonable jury could conclude City created an atmosphere where coworkers were primed to distrust Ms. Vandegrift by telling them she filed an EEO complaint, and this atmosphere could have dissuaded a reasonable worker from making a charge of discrimination. After the City transferred Ms. Vandegrift to a different squad, the new squad held a meeting in

which supervisory-level employees told the squad Ms. Vandegrift made an EEO complaint and to "watch what they say around her."[229]  These employees had no apparent need to know about Ms. Vandegrift's internal EEO complaint.  A reasonable jury could understand the statement by the supervisory employees as implying Ms. Vandegrift could not be trusted.

Supervisory-level employees testified about the importance of trust in the Philadelphia Police Department.  Captain Derbyshire explained he would be concerned if a detective said another detective could not be trusted; he would have addressed the issue if he knew about it. Captain Derbyshire also testified if detectives do not speak with each other, it could affect the detectives' abilities to do their jobs.  Lieutenant Linneman testified trust between police officers is a "big deal."[230]

Ms. Vandegrift also testified about the importance of coworker trust within the Philadelphia Police Department.  In response to a question regarding her joking response to the Jerry Jones text message, Ms. Vandegrift explained:

> [W]hen you're in a male-dominated workplace, well, particularly my male-dominated workplace, it's almost like you're stored into groups.  You know?  You're like that female that complains, the rat, the one who breaks the code of silence, the one you cannot trust.  You're a whore.  You just fuck everybody. You're a lesbian.  You're, you're butch.  You're a bitch.  I mean, this – these are what my male colleagues have said throughout my career.
>
> Listen, if they're going to put me in a category and call me a whore, at least they trust me.  I'm, I'm looking for somebody to have my back.  I was trained as a police officer.  For so many years I depended on these people to help save lives together and also to have my back.  I mean, I couldn't survive on this job without trust. So am I going to turn around and say, you know, "Hey guys, that's offensive," and then put up this wall that they know, oh, okay, she's one of them, and then they, you know, write that somewhere in their minds.  I at the time was not willing to risk that.[231]

Ms. Vandegrift testified members of 2 Squad would not to talk to her: "I used to work at 2 Squad.  We got along quite well.  However, after Detective Kerwin told me what had happened, suddenly we were strangers.  They turned their back on me.  They wouldn't to [sic] speak to me.  They didn't even want to act like I was in the room."[232]

Based on this evidence, a reasonable jury could conclude a reasonable woman in Ms. Vandegrift's position might have been dissuaded from making a charge of discrimination based on the City's act of telling her coworkers she filed an EEO complaint.

The cases cited by the City do not persuade us otherwise.  In *Van Dyke v. Partners of Debevoise & Plimpton LLP*, the court held the plaintiff did not allege sufficient facts demonstrating a materially adverse action.[233]  The plaintiff alleged she suffered malicious gossip and retaliatory and harassing comments from unidentified individuals connected to the defendant, and these individuals leaked sensitive information about the plaintiff by posting the information on the comment section of online articles.[234]  The court determined it could not "conclude that unknown individuals with knowledge of [the plaintiff's] EEOC complaints against [the defendant] made comments on seemly [sic] unrelated articles on [the website] in retaliation to her EEOC charges."[235]  In contrast to the vague allegations of online posts by unknown individuals in *Van Dyke*, Ms. Vandegrift adduces specific evidence of supervisory-level employees advising Ms. Vandegrift's coworkers she made an EEO complaint and to watch what they say around her.

In *Brooks v. City of San Mateo*, the plaintiff returned to work after alleging sexual assault against a coworker and noticed her coworkers shunned her, and she argued the shunning constituted an adverse employment action.[236]  The Court of Appeals for the Ninth Circuit held "[b]ecause an employer cannot force employees to socialize with one another, ostracism suffered

at the hands of coworkers cannot constitute an adverse employment action."[237]   There were no facts demonstrating the employer facilitated the coworker ostracism.  By contrast, Ms. Vandegrift demonstrates evidence supervisory-level employees played a role in creating a distrustful atmosphere.

The remaining cases cited by the City are not persuasive because they do not use the relevant standard.  In 2006, the Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White* held a plaintiff claiming retaliation must demonstrate the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[238]   The cases from the Second Circuit cited by the City use a different standard which preceded *Burlington*, requiring "a 'materially adverse change' in the terms and conditions of employment."[239]

### 2.   Lower level employees' conduct cannot be imputed to the City.

Although the conduct of supervisory-level employees sufficient to constitute a materially adverse action, we do not find the conduct by lower level employees sufficient because of the lack of demonstrated respondeat superior liability.   Ms. Vandegrift argues the spreading of rumors about her having sexual relations with her former lieutenant constitutes an adverse action. The only evidence about how these rumors spread consists of Detective Robert Kerwin told Ms. Vandegrift her "squad" told him "not to trust her because she was fucking the last out lieutenant and that she backstabbed him by making a complaint against him."[240]   Without evidence of whether supervisory-level employees in the squad spread these rumors, a reasonable jury could not attribute the spreading of these rumors to the City without resorting to speculation.

Ms. Vandegrift does not argue the spreading of rumors by coworkers can be attributed to the City under the doctrine of respondeat superior.  Even if she did, this argument would fail.  To succeed on a claim of retaliatory harassment by coworkers, Ms. Vandegrift must show

management "knew or should have known about the harassment, but 'failed to take prompt and adequate remedial action.'"[241]  Captain Derbyshire testified he did not hear any rumors about Ms. Vandegrift having a sexual relationship with a lieutenant.  He only heard Ms. Vandegrift "was upset and that she did not – it wasn't working out.  That the 2 Squad situation was not working out.  That was all I needed, and with that I went to my boss."[242]  Ms. Vandegrift did not provide any evidence she told a management-level employee—prior to her transfer to the Southwest Division—about the rumors of her engaging in a sexual relationship with a lieutenant. Ms. Vandegrift failed to provide evidence management knew or should have known about the rumors spread by her coworkers.

### 3.  The City reassigned Ms. Vandegrift to another division.

Ms. Vandegrift's transfer out of the South Detectives Division to the Southwest Division constitutes a materially adverse action.  She argues the Southwest Division is an extremely busy and hectic place to work.  As explained by the Supreme Court in *Burlington*, "Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."[243]  In *McKinnon v. Gonzales*, the court concluded a reasonable jury could find the plaintiff's transfer to a unit the plaintiff described as "out of control" constituted a materially adverse action.[244]  We similarly find Ms. Vandegrift's transfer to an extremely busy and hectic workplace could reasonably dissuade a reasonable person in Ms. Vandegrift's position from making a charge of discrimination.

### 4.   The City charged Ms. Vandegrift with misconduct.

Ms. Vandegrift argues the City's act of charging her with misconduct constitutes a materially adverse action.  The City counters the misconduct charge is not materially adverse because Ms. Vandegrift's conduct warranted discipline.

At least one district court in our Circuit has held an employer's issuance of a disciplinary charge constitutes an adverse action.[245]  We likewise find the City's decision to charge Ms. Vandegrift with misconduct constitutes an adverse employment action because a reasonable jury could find a charge might dissuade a reasonable employee from making a charge of discrimination.

We reject the City's argument the misconduct charge is warranted and thus fails to constitute a materially adverse action.  Under the prevailing definition of materially adverse action, such an action need not be unwarranted or unjustified.  The action need only dissuade a reasonable employee from making a charge of discrimination.

The City could have argued it had a "legitimate, nonretaliatory reason" for charging Ms. Vandegrift with misconduct.[246] The burden would then shift back to Ms. Vandegrift to prove the City's "proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[247]  Instead of arguing the City has a legitimate, nonretaliatory reason for its conduct, the City challenges the "adverse action" element of Ms. Vandegrift's *prima facie* case, arguing her misconduct charge cannot constitute an adverse action.  At this stage, we do not analyze whether conduct alleged to constitute an adverse action is justified.  We merely review whether the conduct might dissuade a reasonable employee from making a charge of discrimination.  The City's charge of misconduct against Ms. Vandegrift—even if the City issued

it consistent with its policies—could dissuade a reasonable employee from making a charge of discrimination.

**E.     The City may be liable for civil rights violations under *Monell*.[248]**

The City argues Ms. Vandegrift fails to provide sufficient evidence for the jury to conclude the City has a custom of sexual harassment which caused her to suffer a constitutional tort.  Ms. Vandegrift argues the City is liable under *Monell* because there is a well-settled custom of sexual harassment in the City.

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom."[249] In the context of a sexual harassment claim, Ms. Vandegrift can establish municipal liability by producing proof the sexual harassment alleged reflects a "practice" or "course of conduct" among municipal officials which is "so permanent and well settled as to virtually constitute law."[250]

Ms. Vandegrift must also show the custom "was the proximate cause of the injuries suffered."[251]  "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."[252]

Ms. Vandegrift must show a policymaker is responsible for the custom by acquiescence.[253] A custom which is "so permanent and well settled as to have the force of law [is] ascribable to municipal decisionmakers."[254]  In this case, the relevant policymaker is the Police Commissioner.[255]

In *Bohen v. City of East Chicago*, the district court, following a bench trial, found supervisory personnel in the City of East Chicago's fire department engaged in "individual acts of harassment" in the course of their duties.[256]   Management officials responsible for the working conditions in the fire department knew the "general picture" of the pattern of sexual harassment.[257]   "Complaints by victims of sexual harassment were addressed superficially if at all, and the department had no policy against sexual harassment."[258]   On appeal, the Court of Appeals for the Seventh Circuit held this absence of action while knowing the "general picture" constituted sufficient evidence of a custom of sexual harassment.[259]

Ms. Vandegrift provides sufficient evidence of a well-settled custom of sexual harassment within the Philadelphia Police Department.  Ms. Vandegrift's coworkers and supervisors directed sex-based conduct toward her and other female employees throughout her employment.  The conduct consisted of sexual advances, comments about women's appearances, remarks about the male employee's desire to have sex with a female employee, rumors of sexual relationships, exposure of genitals, and sexual assault.  Ms. Vandegrift faced harassment in all of the divisions she worked in at the Philadelphia Police Department up to her transfer to the Southwest Division, and it persisted throughout her employment.  Even Captain Derbyshire, a high ranking official, testified he heard male members of the Police Department talk about having sex with women and about women's appearances or body parts.[260]   Chief Inspector Holmes testified female police officers hear comments about sex while working in the Police Department.[261]

Lieutenant Saggese, a sixteen year investigator in the police's internal affairs division, told Ms. Vandegrift certain employees have "carte blanche" to act the way they do, and he had "run into a brick wall" regarding other investigations.[262]   He also told Ms. Vandegrift other sexual allegations against "higher-ups" are swept under the rug.[263]   This statement demonstrates

high level officials knew and ignored complaints of sexual harassment against high level employees.

Consistent with Lieutenant Saggese's statement, Chief Inspector Holmes twice faced charges of sexual assaulting a female police officer and both times the investigators did not find sufficient evidence to sustain the allegations. As to Officer Hayburn's accusation of sexual assault against Chief Inspector Holmes, the investigation resulted in a finding of "not sustained" even though Officer Hayburn had two witnesses who corroborated her account of the events and the City discovered Chief Inspector Holmes' semen in his city-issued vehicle.[264]

As to Ms. Vandegrift's accusation of sexual assault, Lieutenant Saggese recommended Ms. Vandegrift's sexual assault complaint be sent to the District Attorney's office for review, but Chief Inspector Flacco declined to do so.[265] The City only found one male employee violated the City's EEO policy, but there is no indication the City disciplined the employee.

Ms. Vandegrift has provided sufficient evidence for a reasonable jury to conclude the City knew of its specific problems with sexual assault and harassment in the police department, at least as to those male superiors and officers in contact with Ms. Vandegrift, but did little or nothing to stop such conduct. A reasonable jury could conclude the Police Commissioner acquiesced in a custom of sexual harassment within the Philadelphia Police Department by not addressing this conduct.

### III.    Conclusion

Ms. Vandegrift would agree, and we do not doubt, the vast majority of superior officers avoid any appearance of impropriety, work to improve their valued public service and build internal morale. But as part of evolving police progress, the police department must not turn a

blind, or at least severely impaired, eye to specific complaints of sexual assault and harassment by identified officers upon the policewomen proudly serving our community.

Ms. Vandegrift adduces facts necessary to create a genuine issue of material fact as to her claims of gender discrimination, hostile work environment, and retaliation under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance.  Ms. Vandegrift also provides sufficient evidence of a well-settled custom of sexual harassment within the Philadelphia Police Department.  In the accompanying order, we deny the City's Motion for summary judgment.

---

[1] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Ms. Vandegrift, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits.  The City filed its Statement of Undisputed Material Facts at ECF Doc. No. 32.  The City filed an appendix at ECF Doc. Nos. 31-1 through 31-13.   Ms. Vandegrift responded to the City's Statement of Undisputed Material Facts at ECF Doc. No. 36-2.  Ms. Vandegrift added documents to the Appendix at ECF Doc. Nos. 36-5 through 36-15.   References to the exhibits in the appendices shall be referred to by bates number, for example, "Appx. 1."

[2] ECF Doc. No. 31-1, at p. 7.

[3] Appx. 415.

[4] Appx. 417–19.

[5] ECF Doc. No. 31-1, at p. 17.

[6] Appx. 419.

[7] Appx. 721.

[8] Appx. 754.

[9] Appx. 754.

[10] Appx. 978.

[11] Appx. 976; Appx. 494.

[12] Appx. 494.

[13] Appx. 976.

[14] Appx. 976; Appx. 496.

[15] Appx. 976.

[16] *Id.*

[17] Appx. 496.

[18] Appx. 968–69.

[19] Appx. 902.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Appx. 903.

[24] Appx. 903.

[25] Appx. 924.

[26] Appx. 944–48.

[27] Appx. 465.

[28] Appx. 429.

[29] Appx. 522.  In the 24th District, these male employees included: Officer Timothy Coleman; Officer George Mullen; Officer Norman Camacho; Officer Vic Rosa; Officer Chris Godfrey; Officer Michael Edinger; Officer Frank Carrelli; Officer Terrance O'Hanlon; Officer Robert Kennedy; Officer Timothy Kocher; Officer Eric Pross; Officer Frank Kober; Officer McLoud; Sergeant Alfred Corson; and Sergeant Michael Gorman.  In the 9th District, the male employees included: Officer Michael Givens; Officer Chris Simone; Officer Leroy Geiger; Officer George Gaspar; Sergeant Thomas Tamulis; Sergeant John Wood; Sergeant Paul DeCarlo; Sergeant James DeAngelo; Lieutenant Anthony LaSalle; Officer Pat Gallagher.  In the South Detectives Division, these employees included: Detective John Ruth; Detective Kevin Conway; Detective Neal Aitken; Detective Wayne Hunter; Detective Joe Dydak; Detective Mike McKenna; Detective Miguel Figueroa; Detective Timothy Quinn; Detective Martin Conners; Sergeant Christopher Morton; Sergeant Maurice Hampton; and Sergeant Maurice Black.

[30] Appx. 1107.

[31] *Id.*

[32] Appx. 429.

[33] Appx. 1104–1105.

[34] Appx. 1105.

[35] Appx. 508.

[36] *Id.*  "Roadhead" refers to a woman giving a man oral sex while he is driving. *Id.*

[37] Appx. 516.

[38] Appx. 557.

[39] *Id.*

[40] Appx. 1007.

[41] Appx. 499.

[42] Appx. 1104.

[43] Appx. 1105.

[44] *Id.*

[45] *Id.*

[46] Appx. 508.

[47] *Id.*

[48] *Id.*

[49] Appx. 522.

[50] Appx. 1104.

[51] Appx. 1110.

[52] Appx. 508.

[53] *Id.*

[54] *Id.*

[55] Appx. 1105.

[56] Appx. 522.

[57] *Id.*

[58] Appx. 1109.

[59] Appx. 1106.

[60] Appx. 522.

[61] Appx. 1107.

[62] *Id.*

[63] Appx. 1109.

[64] Appx. 1110.

[65] Appx. 509.

[66] Appx. 1107.

[67] *Id.*

[68] *Id.*

[69] Appx. 1108.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] Appx. 435.

[77] Appx. 582.

[78] Appx. 475.

[79] Appx. 138.

[80] Appx. 1007.

[81] *Id.*

[82] Appx. 436, 476.  Ms. Vandegrift responded, "Guess I didn't do it good enough.  Still haven't landed my M through f weekends off gig."  Appx. 476.  Detective Aiken responded, "It's not all it's cracked up to be. (Does that mean I did him?)", to which Ms. Vandegrift said, "No it means u blew him lol."  Appx. 1111–1113.

[83] Appx. 477–78.

[84] Appx. 135.

[85] Appx. 430–31.

[86] *Id.*

[87] Appx. 431.

[88] Appx. 437.

[89] Appx. 1119.

[90] Appx. 138–39.

[91] Appx. 166.

[92] Appx. 508.

[93] Appx. 511.

[94] Appx. 214.  There are four squads in the South Detectives Division.

[95] *Id.*

[96] *Id.*

[97] Appx. 448.

[98] *Id.*

[99] Appx. 214.

[100] Appx. 559.

[101] *Id.*

[102] Appx. 461.

[103] Appx. 588.

[104] Appx. 606.

[105] *Id.*

[106] Appx. 214.

[107] Appx. 215.

[108] Appx. 214.

[109] Appx. 216.

[110] Appx. 511.

[111] Appx. 886.

[112] Appx. 511.

[113] Appx. 487.

[114] *Id.*

[115] Appx. 215.

[116] *Id.*

[117] Appx. 555.

[118] Appx. 603.

[119] ECF Doc. No. 35-2, at p. 3.   In today's separate Memorandum, we limit Mr. Torchia's opinions to nonlegal matters not based on setting a legal standard and then claiming the City violated the legal standard.

[120] ECF Doc. No. 8, ¶ 52; Appx. 822.

[121] ECF Doc. No. 8, ¶ 52; Appx. 822.

[122] Appx. 1131.

[123] Appx. 1135–37.

[124] Appx. 470–71.

[125] Appx. 555, 1130.

[126] Appx. 1130.

[127] Appx. 475.

[128] Appx. 478.

[129] *Id.*

[130] *Id.*

[131] Appx. 619.

[132] Appx. 620.

[133] Appx. 856.

[134] Appx. 605–06.

[135] Appx. 606.

[136] Appx. 668.

[137] 42 U.S.C. § 2000e *et seq.*

[138] 43 Pa. C.S.A. § 951 *et seq.*

[139] Phila. Code. § 9-1101 *et seq.*

[140] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[141] The City also moved for summary judgment on the grounds Ms. Vandegrift could not show a *prima facie* case of sex discrimination or wage discrimination under Title VII, the PHRA, or the Philadelphia Ordinance.  Ms. Vandegift, however, clarified during the September 8, 2016 Rule 16 conference the only sex discrimination claims she is pursuing under these statutes are for a sex-based hostile work environment, and in her response she does not defend any other sex discrimination theory under these statutes.   We accordingly analyze Ms. Vandegrift's sex discrimination claims under Title VII, the PHRA, or the Philadelphia Ordinance for whether they satisfy the requirements under the hostile work environment theory.

[142] 43 P.S. § 962.1(d).

[143] Philadelphia Home Rule Charter, 351 Pa. Code §§ 3.3-100(e), 4.4-700, 4.4-701.

[144] Phila. Code § 9-1103(1).

[145] *Id.* § 9-1112(1).

[146] *Id.* § 9-1112(3).  This provision provides "No complaint shall be considered unless it is filed with the Commission within three hundred (300) days after the occurrence of the alleged unlawful practice." *Id.*

[147] *Id.* § 9-1112(4).

[148] *Id.* § 9-1122(1).

[149] *Id.* § 9-1122)(4).

[150] *Ives v. NHS Human Servs., Inc.*, No. 15-5317, 2016 WL 4039644, at *3 (E.D. Pa. July 28, 2016).

[151] *Id.* at *4.

[152] *Id.*

[153] *Id.*

[154] *Ahern v. Eresearch Tech., Inc.*, 2016 WL 4501648, at *2–3 (E.D. Pa. Apr. 29, 2016).

[155] *City of Philadelphia v. City of Philadelphia Tax Review Bd. ex rel. Keystone Health Plan E., Inc.*, 132 A.3d 946, 952 (Pa. 2015) (citing *Bailey v. Zoning Bd. of Adjustment*, 801 A.2d 492, 502 n.19 (Pa. 2002)).

[156] *Id.*

[157] *Id.* (citing 1 Pa. C.S. § 1921(b)).

[158] *Id.* (citing *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co.*, 96 A.3d 346, 354–55 (Pa. 2014).

[159] *Id.* (citing *Warrantech Consumer Prods. Servs., Inc.*, 96 A.3d at 354–55).

[160] 1 Pa. C.S. § 1921(c)(3), (4), (6).

[161] Phila. Code § 9-1122(1).

[162] *Id.* § 9-1122(4).

[163] *Id.* § 9-1101(1)(b).

[164] *Id.* § 9-1101(1)(e).

[165] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013) (quoting 43 Pa. Stat. § 959(h)).

[166] *Id.* at 165 (quoting 42 U.S.C. § 2000e–5(e)(1)).

[167] *Sameric Corp. of Delaware v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998).

[168] *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995).

[169] *Id.* at 165 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) (brackets omitted).

[170] *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114).

[171] *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

[172] *Id.*

[173] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)).
[174] *Mandel*, 706 F.3d at 165.

[175] *Id.* (quoting *O'Connor*, 440 F.3d at 127).

[176] *Mandel*, 706 F.3d at 165–66.

[177] *Id.* at 166.

[178] *Id.* at 166 n.2.

[179] *Compare Illas v. Gloucester Cty. Sheriff's Dep't*, No. 14-4061, 2015 WL 778806, at *5 (D.N.J. Feb. 24, 2015) (sexual assault a discrete act because it is individually actionable), *and Onuffer v. Walker*, No. 13-4208, 2014 WL 3408563, at *6 (E.D. Pa. July 14, 2014) (same), *with Hague v. Alex E. Paris Contracting Co., Inc.*, No. 14-655, 2016 WL 5468118, at *5 (W.D. Pa. Sept. 29, 2016) (rape not a discrete act because it constituted "merely the first unlawful employment practice" and "all subsequent events stemmed from it").

[180] *See Illas*, 2015 WL 778806, at *5; *Onuffer*, 2014 WL 3408563, at *6.

[181] *Sager v. Harvey*, No. 06-3089, 2007 WL 984163, at *8 (D. Minn. Mar. 30, 2007).

[182] *Id.*

[183] *Hague*, 2016 WL 5468118, at *5.

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986).

[188] *Id.* at 60.

[189] *Id.* at 67 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

[190] *Id.*

[191] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114.

[192] *Meritor Sav. Bank, FSB*, 477 U.S. at 67 (quoting *Henson*, 682 F.2d at 904).

[193] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)).

[194] *Mandel*, 706 F.3d at 165–66.

[195] Appx. 465.

[196] Appx. 429.

[197] Appx. 522.

[198] Appx. 429.

[199] Appx. 978.

[200] Appx. 966.

[201] Appx. 1105.

[202] Appx. 522.

[203] Appx. 522.

[204] Appx. 1110.

[205] Appx. 435.

[206] "[T]he PHRA is to be interpreted as identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)). Similarly, claims under the Philadelphia Fair Practices Ordinance are analyzed under the same framework as Title VII and PHRA claims. *Childers v. Trustees of the Univ. of Pennsylvania*, No. 14-2439, 2016 WL 1086669, at *6 n.4 (E.D. Pa. Mar. 21, 2016). Ms. Vandegrift does not point to specific language requiring different treatment.

[207] *Mandel*, 706 F.3d at 167 (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).

[208] *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[209] *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

[210] *Mandel*, 706 F.3d at 168 (quoting *Caver*, 420 F.3d at 262–63).

[211] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).

[212] *Brooks v. City of Philadelphia*, No. 14-623, 2015 WL 505405, at *1, *6 (E.D. Pa. Feb. 6, 2015).

[213] *Id.* at *1.

[214] *Id.*

[215] *Id.* at *6.

[216] *Jensen*, 435 F.3d at 452 (quoting *Burlington Indus., Inc.*, 524 U.S. at 765).

[217] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 145–46 (2004) (quoting *Burlington Indus., Inc.*, 524 U.S. at 765).

[218] *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d Cir. 2001)).

[219] *Id.* at 104–105.

[220] *Kidd v. Pennsylvania*, No. 97-5577, 1999 WL 391496, at *7 (E.D. Pa. May 20, 1999).

[221] ECF Doc. No. 35-2, at p. 3.

[222] *Jones*, 796 F.3d at 329 (quoting *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015)).

[223] *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

[224] *Id.* (citing *Marra*, 497 F.3d at 300).

[225] *Id.* at 195 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

[226] *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.

[227] *Id.*

[228] *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.

[229] Appx. 559.

[230] Appx. 606.

[231] Appx. 436.

[232] Appx. 461.

[233] *Van Dyke v. Partners of Debevoise & Plimpton LLP*, No. 12-8354, 2013 WL 5375542, at *10 (S.D.N.Y. Sept. 24, 2013).

[234] *Id.*

[235] *Id.*

[236] *Brooks v. City of San Mateo*, 229 F.3d 917, 928–29 (9th Cir. 2000).

[237] *Id.* at 929.

[238] *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

[239] *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).

[240] Appx. 559.

[241] *Jensen*, 435 F.3d at 453 (quoting *Andrews*, 895 F.2d at 1486).

[242] Appx. 215.

[243] *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 70–71.

[244] *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 427 (D.N.J. 2009).

[245] *See Giel v. Feasterville Fire Co.*, No. 07-1186, 2008 WL 2812972, at *3 (E.D. Pa. July 21, 2008).

[246] *Daniels*, 776 F.3d at 193 (citing *Marra*, 497 F.3d at 300).

[247] *Id.* (citing *Marra*, 497 F.3d at 300).

[248] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

[249] *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (citing *Monell*, 436 U.S. 658).

[250] *Hargrave v. Cty. of Atl.*, 262 F. Supp. 2d 393, 443 (D.N.J. 2003) (quoting *Andrews*, 895 F.2d at 1480).

[251] *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

[252] *Id.* at 851.

[253] *Andrews*, 895 F.2d at 1480.

[254] *Bielevicz*, 915 F.2d at 850.

[255] *Andrews*, 895 F.2d at 1481.

[256] *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1189 (7th Cir. 1986).

[257] *Id.*

[258] *Id.*

[259] *Id.*

[260] Appx. 230.

[261] Appx. 754.

[262] ECF Doc. No. 8, ¶ 52; Appx. 822.

[263] ECF Doc. No. 8, ¶ 52; Appx. 822.

[264] Appx. 944–48.

[265] Appx. 839.